

Ethan Jones, WSBA No. 46911
Anthony Aronica, WSBA No. 54725
Yakama Nation Office of Legal Counsel
P.O. Box 150 / 401 Fort Road
Toppenish, WA 98948
(509) 865-7268
ethan@yakamanation-olc.org
anthony@yakamanation-olc.org

Attorneys for the Confederated Tribes and
Bands of the Yakama Nation

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CONFEDERATED TRIBES AND BANDS OF THE YAKAMA NATION, a sovereign federally recognized Indian Tribe,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF TOPPENISH, a municipality of the State of Washington<br><br>Defendant. | Case No.: 1:24-cv-03189<br><br><br>DECLARATION OF ETHAN JONES IN SUPPORT OF PLAINTIFF's MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |

I, Ethan Jones, declare and say that:

1.    I am the Lead Attorney for the Yakama Nation Office of Legal Counsel, and I am Attorney of Record for Plaintiff in this action. I make this Declaration in support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. The following statements are based on my personal knowledge.

DECLARATION OF ETHAN JONES IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION — 1

YAKAMA NATION
OFFICE OF LEGAL COUNSEL
P.O. Box 150 / 401 Fort Road
Toppenish, WA 98948
Phone (509) 865-7268

2.     Attached as **Exhibit A** is a true and correct copy of the Treaty with the Yakamas of June 9, 1855, codified at 12 Stat. 951.

3.     Attached as **Exhibit B** is a true and correct copy of the grant from the Yakima County Commissioners for the Yakama Nation's Iniinu't 24-hour Emergency Cold Weather Shelter.

4.     Attached as **Exhibit C** is a true and correct copy of Yakama Nation Tribal Council Resolution T-010-25 approving the Iniinu't 24-hour Emergency Cold Weather Shelter at the Yakima Valley Farmworkers Clinic's property.

5.     Attached as **Exhibit D** is a true and correct copy of the Yakama Nation's letter dated November 12, 2024 (sent November 15, 2024) addressed to the City of Toppenish.

6.     Attached as **Exhibit E** is a true and correct copy of the City of Toppenish's November 18, 2024 letter addressed to the Yakama Nation.

7.     Attached as **Exhibit F** is a true and correct copy of the Yakama Nation's November 20, 2024 letter addressed to the City of Toppenish.

8.     Attached as **Exhibit G** is a true and correct copy of the National Weather Service's seven (7) day forecast for Toppenish, Washington, starting on November 21, 2024.

YAKAMA NATION
OFFICE OF LEGAL COUNSEL
P.O. Box 150 / 401 Fort Road
Toppenish, WA 98948
Phone (509) 865-7268

9.      Attached as **Exhibit H** is a true and correct copy of *Glacier Elec. Coop., Inc. v. Gervais*, 2015 U.S. Dist. LEXIS 193816 (D. Mont. 2015).

10.     Attached as **Exhibit I** is a true and correct copy of *Rincon Mushroom Corp. of Am. v. Mazzetti,* 2024 U.S. App. LEXIS 14952 (D. Mont. 2024) (un-published).

11.     I declare under penalty of perjury under the laws of the United States of America that the foregoing information is true and correct.

Respectfully submitted this 21st day of November, 2024.

Ethan Jones, WSBA No. 46911
YAKAMA NATION OFFICE OF LEGAL COUNSEL
P.O. Box 151, 401 Fort Road
Toppenish, WA 98948
Telephone: (509) 865-7268
Facsimile: (509) 865-4713
ethan@yakamanation-olc.org

*Attorney for the Confederated Tribes and Bands of the Yakama Nation*

DECLARATION OF ETHAN JONES IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION — 3

YAKAMA NATION
OFFICE OF LEGAL COUNSEL
P.O. Box 150 / 401 Fort Road
Toppenish, WA 98948
Phone (509) 865-7268

**EXHIBIT A**

Declaration of Ethan Jones in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction

*Treaty between the United States and the Yakama Nation of Indians. Concluded at Camp Stevens, Walla-Walla Valley, June 9, 1855. Ratified by the Senate, March 8, 1859. Proclaimed by the President of the United States, April 18, 1859.*

# JAMES BUCHANAN,

## PRESIDENT OF THE UNITED STATES OF AMERICA,

TO ALL AND SINGULAR TO WHOM THESE PRESENTS SHALL COME, GREETING:   June 9, 1855.

WHEREAS a treaty was made and concluded at the Treaty Ground, Camp Stevens, Walla-Walla Valley, on the ninth day of June, in the year one thousand eight hundred and fifty-five, between Isaac I. Stevens, governor, and superintendent of Indian affairs, for the Territory of Washington, on the part of the United States, and the hereinafter named head chief, chiefs, headmen and delegates of the Yakama, Palouse, Pisquouse, Wenatshapam, Klikatat, Klinquit, Kow-was-say-ee, Li-ay-was, Skin-pah, Wish-ham, Shyiks, Oche-chotes, Kah-milt-pah, and Se-ap-cat, confederate tribes and bands of Indians, occupying lands lying in Washington Territory, who, for the purposes of this treaty, are to be considered as one nation, under the name of "Yakama," with Kamaiakun as its Head Chief, on behalf of and acting for said bands and tribes, and duly authorized thereto by them; which treaty is in the words and figures following, to wit: *Preamble.*

Articles of agreement and convention made and concluded at the treaty ground, Camp Stevens, Walla-Walla Valley, this ninth day of June, in the year one thousand eight hundred and fifty-five, by and between Isaac I. Stevens, governor and superintendent of Indian affairs for the Territory of Washington, on the part of the United States, and the undersigned head chief, chiefs, headmen and delegates of the Yakama, Palouse, Pisquouse, Wenatshapam, Klikatat, Klinquit, Kow-was-say-ee, Li-ay-was, Skin-pah, Wish-ham, Shyiks, Oche-chotes, Kah-milt-pah, and Se-ap-cat, confederated tribes and bands of Indians, occupying lands hereinafter bounded and described and lying in Washington Territory, who for the purposes of this treaty are to be considered as one nation, under the name of "Yakama," with Kamaiakun as its head chief, on behalf of and acting for said tribes and bands, and being duly authorized thereto by them. *Contracting parties.*

ARTICLE I.  The aforesaid confederated tribes and bands of Indians hereby cede, relinquish, and convey to the United States all their right, title, and interest in and to the lands and country occupied and claimed by them, and bounded and described as follows, to wit:  *Cession of lands to the United States.*

Commencing at Mount Ranier, thence northerly along the main ridge of the Cascade Mountains to the point where the northern tributaries of Lake Che-lan and the southern tributaries of the Methow River have their rise; thence southeasterly on the divide between the waters of Lake Che-lan and the Methow River to the Columbia River; thence, crossing the Columbia on a true east course, to a point whose longitude is one hundred and nineteen degrees and ten minutes (119° 10',) which two latter lines separate the above confederated tribes and bands from the Oakinakane tribe of Indians; thence in a true south course to the  *Boundaries.*

forty-seventh (47°) parallel of latitude; thence east on said parallel to the main Palouse River, which two latter lines of boundary separate the above confederated tribes and bands from the Spokanes; thence down the Palouse River to its junction with the Moh-hah-ne-she, or southern tributary of the same; thence, in a southesterly direction, to the Snake River, at the mouth of the Tucannon River, separating the above confederated tribes from the Nez Percé tribe of Indians; thence down the Snake River to its junction with the Columbia River; thence up the Columbia River to the "White banks," below the Priest's rapids; thence westerly to a lake called "La Lac;" thence southerly to a point on the Yakama River called Toh-mah-luke; thence, in a southwesterly direction, to the Columbia River, at the western extremity of the "Big Island," between the mouths of the Umatilla River and Butler Creek; all which latter boundaries separate the above confederated tribes and bands from the Walla-Walla, Cayuse, and Umatilla tribes and bands of Indians; thence down the Columbia River to midway between the mouths of White Salmon and Wind Rivers; thence along the divide between said rivers to the main ridge of the Cascade Mountains; and thence along said ridge to the place of beginning.

**Reservation.** ARTICLE II. There is, however, reserved, from the lands above ceded for the use and occupation of the aforesaid confederated tribes and bands of Indians, the tract of land included within the following boundaries, to wit:

**Boundaries.** Commencing on the Yakama River, at the mouth of the Attah-nam River; thence westerly along said Attah-nam River to the forks; thence along the southern tributary to the Cascade Mountains; thence southerly along the main ridge of said mountains, passing south and east of Mount Adams, to the spur whence flows the waters of the Klickatat and Pisco rivers; thence down said spur to the divide between the waters of said rivers; thence along said divide to the divide separating the waters of the Satass River from those flowing into the Columbia River; thence along said divide to the main Yakama, eight miles below the mouth of the Satass River; and thence up the Yakama River to the place of beginning.

**Reservation to be set apart, &c. and Indians to settle thereon; whites not to reside thereon.** All which tract shall be set apart, and, so far as necessary, surveyed and marked out, for the exclusive use and benefit of said confederated tribes and bands of Indians, as an Indian reservation; nor shall any white man, excepting those in the employment of the Indian Department, be permitted to reside upon the said reservation without permission of the tribe and the superintendent and agent. And the said confederated tribes and bands agree to remove to, and settle upon, the same, within one year after the ratification of this treaty. In the mean time it shall be lawful for them to reside upon any ground not in the actual claim and occupation of citizens of the United States; and upon any ground claimed or occupied, if with the permission of the owner or claimant.

Guaranteeing, however, the right to all citizens of the United States, to enter upon and occupy as settlers any lands not actually occupied and cultivated by said Indians at this time, and not included in the reservation above named.

**Improvements to be paid for by the United States.** And provided, That any substantial improvements heretofore made by any Indian, such as fields enclosed and cultivated, and houses erected upon the lands hereby ceded, and which he may be compelled to abandon in consequence of this treaty, shall be valued, under the direction of the President of the United States, and payment made therefor in money; or improvements of an equal value made for said Indian upon the reservation. And no Indian will be required to abandon the improvements aforesaid, now occupied by him, until their value in money, or improvements of an equal value shall be furnished him as aforesaid.

ARTICLE III. And provided, That, if necessary for the public con-

venience, roads may be run through the said reservation; and on the *Roads may be* other hand, the right of way, with free access from the same to the nearest *made.* public highway, is secured to them; as also the right, in common with citizens of the United States, to travel upon all public highways.

The exclusive right of taking fish in all the streams, where running *Privileges se-* through or bordering said reservation, is further secured to said confed- *cured to Indians.* erated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land.

ARTICLE IV.   In consideration of the above cession, the United States *Payments by* agree to pay to the said confederated tribes and bands of Indians, in addi- *the United* tion to the goods and provisions distributed to them at the time of signing *States;* this treaty, the sum of two hundred thousand dollars, in the following manner, that is to say: sixty thousand dollars, to be expended under the direction of the President of the United States, the first year after the ratification of this treaty, in providing for their removal to the reservation, breaking up and fencing farms, building houses for them, supplying them with provisions and a suitable outfit, and for such other objects as he may deem necessary, and the remainder in annuities, as follows: for the first five years after the ratification of the treaty, ten thousand dollars each year, commencing September first, 1856; for the next five years, eight thousand dollars each year; for the next five years, six thousand dollars per year; and for the next five years, four thousand per year.

All which sums of money shall be applied to the use and benefit of said *how to be ap* Indians, under the direction of the President of the United States, who *plied.* may from time to time determine, at his discretion, upon what beneficial objects to expend the same for them.   And the superintendent of Indian affairs, or other proper officer, shall each year inform the President of the wishes of the Indians in relation thereto.

ARTICLE V.   The United States further agree to establish at suitable *United States* points within said reservation, within one year after the ratification hereof, *to establish* two schools, erecting the necessary buildings, keeping them in repair, and *schools,* providing them with furniture, books, and stationery, one of which shall be an agricultural and industrial school, to be located at the agency, and to be free to the children of the said confederated tribes and bands of Indians, and to employ one superintendent of teaching and two teachers; to build two blacksmiths' shops, to one of which shall be attached a tin *mechanics'* shop, and to the other a gunsmith's shop; one carpenter's shop, one wagon *shops,* and ploughmaker's shop, and to keep the same in repair and furnished with the necessary tools; to employ one superintendent of farming and two farmers, two blacksmiths, one tinner, one gunsmith, one carpenter, one wagon and ploughmaker, for the instruction of the Indians in trades and to assist them in the same; to erect one saw-mill and one flouring- *saw-mill and* mill, keeping the same in repair and furnished with the necessary tools *flouring-mill,* and fixtures; to erect a hospital, keeping the same in repair and provided *hospital.* with the necessary medicines and furniture, and to employ a physician; and to erect, keep in repair, and provided with the necessary furniture, the buildings required for the accommodation of the said employees. The said buildings and establishments to be maintained and kept in repair as aforesaid, and the employees to be kept in service for the period of twenty years.

And in view of the fact that the head chief of the said confederated *Salary to head* tribes and bands of Indians is expected, and will be called upon, to per- *chief; house, &c* form many services of a public character, occupying much of his time, the United States further agree to pay to the said confederated tribes and bands of Indians five hundred dollars per year, for the term of twenty years after the ratification hereof, as a salary for such person as the said

confederated tribes and bands of Indians may select to be their head chief; to build for him at a suitable point on the reservation a comfortable house and properly furnish the same, and to plough and fence ten acres of land. The said salary to be paid to, and the said house to be occupied by, such head chief so long as he may continue to hold that office.

*Kamaiakun is the head chief.* And it is distinctly understood and agreed that at the time of the conclusion of this treaty Kamaiakun is the duly elected and authorized head chief of the confederated tribes and bands aforesaid, styled the Yakama nation, and is recognized as such by them and by the commissioners on the part of the United States holding this treaty ; and all the expenditures and expenses contemplated in this article of this treaty shall be defrayed by the United States, and shall not be deducted from the annuities agreed to be paid to said confederated tribes and bands of Indians. Nor shall the cost of transporting the goods for the annuity payments be a charge upon the annuities, but shall be defrayed by the United States.

*Reservation may be surveyed into lots, and assigned to individuals or families.* ARTICLE VI. The President may, from time to time, at his discretion, cause the whole or such portions of such reservation as he may think proper, to be surveyed into lots, and assign the same to such individuals or families of the said confederated tribes and bands of Indians as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations *Vol. x. p. 1044.* as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable.

*Annuities not to pay debts of individuals.* ARTICLE VII. The annuities of the aforesaid confederated tribes and bands of Indians shall not be taken to pay the debts of individuals.

*Tribes to preserve friendly relations;* ARTICLE VIII. The aforesaid confederated tribes and bands of Indians acknowledge their dependence upon the government of the United States, and promise to be friendly with all citizens thereof, and pledge themselves to commit no depredations upon the property of such citizens.

*to pay for depredations;* And should any one or more of them violate this pledge, and the fact be satisfactorily proved before the agent, the property taken shall be returned, or in default thereof, or if injured or destroyed, compensation may be made by the government out of the annuities.

*not to make war but in self-defence;* Nor will they make war upon any other tribe, except in self-defence, but will submit all matters of difference between them and other Indians to the government of the United States or its agent for decision, and abide thereby. And if any of the said Indians commit depredations on any other Indians within the Territory of Washington or Oregon, the same rule shall prevail as that provided in this article in case of depredations *to surrender offenders.* against citizens. And the said confederated tribes and bands of Indians agree not to shelter or conceal offenders against the laws of the United States, but to deliver them up to the authorities for trial.

*Annuities may be withheld from those who drink ardent spirits.* ARTICLE IX. The said confederated tribes and bands of Indians desire to exclude from their reservation the use of ardent spirits, and to prevent their people from drinking the same, and, therefore, it is provided that any Indian belonging to said confederated tribes and bands of Indians, who is guilty of bringing liquor into said reservation, or who drinks liquor, may have his or her annuities withheld from him or her for such time as the President may determine.

*Wenatshapam fishery reserved.* ARTICLE X. *And provided,* That there is also reserved and set apart from the lands ceded by this treaty, for the use and benefit of the aforesaid confederated tribes and bands, a tract of land not exceeding in quantity one township of six miles square, situated at the forks of the Pisquouse or Wenatshapam River, and known as the " Wenatshapam fishery," which said reservation shall be surveyed and marked out whenever the President may direct, and be subject to the same provisions and restrictions as other Indian reservations.

*When treaty to take effect.* ARTICLE XI. This treaty shall be obligatory upon the contracting parties as soon as the same shall be ratified by the President and Senate of the United States.

In testimony whereof, the said Isaac I. Stevens, governor and super- *Signatures,* intendent of Indian affairs for the Territory of Washington, and the under- *June 9, 1855.* signed head chief, chiefs, headmen, and delegates of the aforesaid confederated tribes and bands of Indians, have hereunto set their hands and seals, at the place and on the day and year hereinbefore written.

ISAAC I. STEVENS,

*Governor and Superintendent.*   [L. S.]

| | | |
|---|---|---|
| KAMAIAKUN, | his x mark. | [L. S.] |
| SKLOOM, | his x mark. | [L. S.] |
| OWHI, | his x mark. | [L. S.] |
| TE-COLE-KUN, | his x mark. | [L. S.] |
| LA-HOOM, | his x mark. | [L. S.] |
| ME-NI-NOCK, | his x mark. | [L. S.] |
| ELIT PALMER, | his x mark. | [L. S.] |
| WISH-OCH-KMPITS, | his x mark. | [L. S.] |
| KOO-LAT-TOOSE, | his x mark. | [L. S.] |
| SHEE-AH-COTTE, | his x mark. | [L. S.] |
| TUCK-QUILLE, | his x mark. | [L. S.] |
| KA-LOO-AS, | his x mark. | [L. S.] |
| SCHA-NOO-A, | his x mark. | [L. S.] |
| SLA-KISH, | his x mark. | [L. S.] |

Signed and sealed in presence of—

James Doty, *Secretary of Treaties,*
Mie. Cles. Pandosy, *O. M. T.,*
Wm. C. McKay,
W. H. Tappan, *Sub Indian Agent, W. T.,*
C. Chirouse, *O. M. T.,*
Patrick McKenzie, *Interpreter,*
A. D. Pamburn, *Interpreter,*
Joel Palmer, *Superintendent Indian Affairs, O. T.,*
W. D. Biglow,
A. D. Pamburn, *Interpreter.*

And whereas, the said treaty having been submitted to the Senate of *Ratification,* the United States for its constitutional action thereon, the said Senate did, *March 8, 1859.* on the eighth day of March, one thousand eight hundred and fifty-nine, advise and consent to the ratification of the same by a resolution in the words and figures following, to wit:

"In Executive Session,

"Senate of the United States, March 8, 1859.

"*Resolved*, (two thirds of the senators present concurring,) That the Senate advise and consent to the ratification of treaty between the United States and the head chief, chiefs, headmen, and delegates of the Yakama, Palouse, and other confederated tribes and bands of Indians, occupying lands lying in Washington Territory, who, for the purposes of this treaty, are to be considered as one nation, under the name of "Yakama," with Kamaiakun as its head chief, signed 9th June, 1855.

"Attest:        "ASBURY DICKINS, *Secretary.*"

Now, therefore, be it known that I, JAMES BUCHANAN, President *Proclamation,* of the United States of America, do, in pursuance of the advice and con- *April 18, 1859.* sent of the Senate, as expressed in their resolution of March eighth, one thousand eight hundred and fifty-nine, accept, ratify, and confirm the said treaty.

TREATY WITH THE YAKAMAS. June 9, 1855.

In testimony whereof, I have hereunto caused the seal of the United States to be affixed, and have signed the same with my hand.

Done at the city of Washington, this eighteenth day of April, in the year of our Lord one thousand eight hundred and fifty-nine, and of the independence of the United States the eighty-third.

[SEAL.]

JAMES BUCHANAN.

By the President:
Lewis Cass, *Secretary of State.*

**EXHIBIT B**

Declaration of Ethan Jones in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction



# BOARD OF YAKIMA COUNTY COMMISSIONERS

## Agenda Request Form (ARF)

*Deliver completed ARF and finalized agenda item to the Clerk or Deputy Clerk of the Board at the Yakima County Commissioners' Office, Room 232.*

**Prepared by:** Kimberly Ruelas

**Department:** Human Services

**Requested Agenda Date:** 09/10/2024

**Presenting:** Lance Larsen

*Board of County Commissioners Record Assigned*

\#     BOCC Agreement

# 333-2024

Yakima County, WA

---

**Action Requested – Check Applicable Box:**

☐ PASS RESOLUTION

☐ PASS ORDINANCE

☐ ISSUE PROCLAMATION

☑ EXECUTE or AMEND
AGREEMENT, CONTRACT, or GRANT

☐ OTHER _____

---

**Document Title:**
Yakama Nation Extreme Winter Weather Shelter 2025 Contract (YN-EWWS-2025)

---

**Background Information:**
This contract between Yakima County and Yakama Nation was awarded as part of the FY2025-2027 Homeless Housing and Assistance Program RFP. The contract grants Yakama Nation $250,000 for Operations expenses from July 1, 2024 through June 30, 2025.

---

**Describe Fiscal Impact:**
$250,000

---

**Summary & Recommendation:**
Recommend to approve.

---

**Department Head/Elected Official Signature**

**Corporate Counsel Initial (for Agreements Only)**    DC

## HUMAN SERVICES CONTRACT FACE SHEET

| CONTRACTOR IS A ☒ SUBRECIPIENT ☐ VENDOR | CONTRACT NUMBER: **YN-EWWS-2025** |
|---|---|

| 1. NAME/ADDRESS:<br>**Yakama Nation**<br>**UEI: Q4EDSUR34U61**<br>**Merida Kipp, Deputy Director**<br>Merida_kipp@yakama.com<br>**PO Box 151**<br>**Toppenish, WA 98951** | 2. ORIGINAL CONTRACT AMOUNT:<br>**$250,000** | 5. PREVIOUS CONTRACT AMOUNT: |
|---|---|---|
| | 3. CASH MATCH REQUIREMENT: | 6. MODIFICATION AMOUNT: |
| | 4. TOTAL CONTRACT AMOUNT:<br>**$250,000** | 7. NEW TOTAL CONTRACT AMOUNT: |

| 8. CONTACT:<br>**Jenece Howe, Program Manager**<br>**508 West 1 Avenue**<br>**Toppenish, WA 98951**<br>**(509) 831-6561**<br>jenece_howe@yakama.com | 9. COUNTY PROGRAM CONTACT:<br>**Yakima County Human Services**<br>**Melissa Holm, Grant Manager**<br>**223 N 1st Street**<br>**Yakima, WA 98901-2639**<br>**(509) 865-5005**<br>Melissa.Holm@co.yakima.wa.us | 10. COUNTY FISCAL CONTACT:<br>**Yakima County Human Services**<br>**Kimberly Ruelas, Accountant II**<br>**223 N 1st Street**<br>**Yakima, WA 98901-2639**<br>**(509) 823-8881**<br>kimberly.ruelas@co.yakima.wa.us |
|---|---|---|

| 11. CONTRACT START DATE:<br>**July 1, 2024** | 12. CONTRACT END DATE:<br>**June 30, 2025** |
|---|---|

| 13. FUNDING AUTHORITY:<br>**Washington State Department of Commerce**<br>**Consolidated Homeless Grant/ Local Housing Fees**<br>**2163** | 14. INDIRECT RATE:<br>**N/A** |
|---|---|

| 15. CFDA NUMBER(s):<br>**N/A** | 16. CFDA TITLE(S):<br>**N/A** |
|---|---|

17. PURPOSE: Homeless Housing and Assistance Grant Award – Emergency Shelter

**EXHIBITS:** When the box below is marked with an X, the following Exhibits are attached and are incorporated into this Contract by reference:

☒ Exhibits (specify):    **EXHIBIT A – Special Terms & Performance Measures**
**EXHIBIT B – Budget**
**EXHIBIT C – Insurance Certificate**
**EXHIBIT D – Uniform Guidance**

This Contract contains all of the terms and conditions agreed upon by the parties and all documents attached or incorporated by reference, include Basic Interagency Agreement or its successor. No other understandings or representations, oral or otherwise, regarding the subject matter of this Contract shall be deemed to exist or bind the parties. The parties signing below warrant that they have read and understand this Contract and have authority to enter into this Contract.

| **Yakama Nation** | **BOARD OF COUNTY COMMISSIONERS** |
|---|---|
| *Gerald Lewis* | **EXCUSED** |
| Gerald Lewis, Tribal Chairman | Amanda McKinney, Chair |
| 8/27/2024 | *Kyle Curtis* |
| Date | Kyle Curtis, Commissioner |
| **Approved as to Form:** | |
| *Daniel Clark* | *LaDon Linde* |
| *Deputy Prosecuting Attorney* | LaDon Linde, Commissioner |
| **Agreement Number** | **DATED** SEP 1 0 2024 |
| | *Attest:* |
| BOCC Agreement | Julie Lawrence, Clerk of the Board or<br>Erin Franklin, Deputy Clerk of the Board |

**3 3 3 - 2 0 2 4**

Yakima County, WA

## GENERAL TERMS AND CONDITIONS

In consideration of the covenants, conditions, performances, and provisions hereinafter contained, the parties hereto agree as follows:

1.  **Definitions:** The words and phrases listed below, as used in the Contract, shall have the following definitions:

    A.  "Contract" The term contract is intended to mean an agreement creating obligations enforceable by law between the County and the contractor. For purposes of this "contract", the parties agree that all terms contained in the General Terms and Conditions and Special Terms and Performance Measures including any Exhibits and other documents, as well as any other attachments, are considered part of the "contract".

    B.  "CFR" means Code of Federal Regulations. All references in this Contract to CFR chapters or sections shall include any successor, amended, or replacement regulation. The CFR may be accessed at http://www.gpoaccess.gov/cfr/index.html.

    C.  "Debarment" means an action taken by a federal official to exclude a person or business entity from participating in transactions involving certain federal funds.

    D.  "Director" means the Director of the Yakima County Department of Human Services.

    E.  "General Terms and Conditions" means the contractual provisions contained within this Contract, which govern the contractual relationship between the County and the Contractor, under this Contract.

    F.  "Personal Information" means information identifiable to any person, including, but not limited to, information that relates to a person's name, health, finances, education, business, use or receipt of governmental services or other activities, addresses, telephone numbers, social security numbers, driver license numbers, other identifying numbers, and any financial identifiers.

    G.  "Principals," which includes officers, members of the Board of Directors, owner(s), or other person(s) with management or supervisory responsibilities relating to the transaction.

    H.  "RCW" means the Revised Code of Washington. All references in this Contract to RCW chapters or sections shall include any successor, amended, or replacement statute. The RCW can be accessed at http://apps.leg.wa.gov/rcw/.

    I.  "Subcontract" means a separate contract between the Contractor and an individual or entity ("Subrecipient") to perform all or a portion of the duties and obligations that the Contractor shall perform pursuant to this Contract.

    J.  "WAC" means the Washington Administrative Code. All references in this Contract to WAC chapters or sections shall include any successor, amended, or replacement regulation. The WAC can be accessed at http://apps.leg.wa.gov/wac/.

2. **Consideration:**  The parties agree that the monetary consideration for this contract shall be identified in the face sheet and contained in the budget section(s) of this Contract.  The parties agree that the face amount of the contract is up to and not to exceed the full consideration due to the Contractor.  Any additional modifications to this agreement regarding consideration must be mutually agreed to and be in writing to be effective.

3. **Amendment:** This Contract, or any term or condition, may only be modified in writing and signed by both parties. Only personnel authorized to bind each of the parties shall sign an amendment.

4. **Assignment:** Except as otherwise provided herein, the Contractor shall not assign rights or obligations derived from this Contract to a third party without the prior, written consent of the County and the written assumption of all of the Contractor's obligations in this Contract by the third party.

5. **Circulars** These requirements apply to the primary recipient of federal funds, and then follow the funds to the Subrecipients.  The Federal Circulars found in Title 2 of the Code of Federal Regulations (CFR) provide the applicable administrative requirements, cost Principles and audit requirements.  The Circulars are applicable to all non-federal recipients of Federal Awards unless specifically excluded.  Subrecipients must follow this Circular and incorporated appendices and any future amendments, and any successor or replacement circulars or regulations.

6. **Compliance with Applicable Law:** At all times during the term of this Contract, the Contractor and the County shall comply with all applicable federal, state, and local laws, regulations, and rules, including but not limited to non-discrimination laws and regulations.

7. **Confidentiality:** The parties shall use Personal Information and other confidential information gained by reason of this Contract only for the purpose of this Contract. The County and the Contractor shall not disclose, transfer, or sell any such information to any other party, except as provided by law or, in the case of Personal Information except as provided by law or with the prior written consent of the person to whom the Personal Information pertains. The parties shall maintain the confidentiality of all Personal Information and other confidential information gained by reason of this Contract and shall return or certify the destruction of such information if requested in writing by the party to this Contract that provided the information.

   A.  Confidential information as used in this section includes:

      I.  All material provided to the Contractor by the County that is designated as "confidential".

      II.  All material produced by the Contractor that is designated as "confidential" by the County.

      III.  All personal information in the possession of the Contractor that may not be disclosed under State or Federal law.  "Personal Information" includes but is not limited to: information related to a person's name, health, finances, education, business, use of government services, addresses, telephone numbers, social security number, driver's license number and other identifying numbers, and "Protected Health Information" (PHI) under the

Federal Health Insurance Portability and Accountability Act of 1996 (HIPPA).

B.  The Contractor shall take all necessary steps to assure that Confidential Information is safeguarded to prevent unauthorized use, sharing, transfer, sale or disclosure, or violation of any State or Federal laws related thereto. Upon request, the Contractor shall provide the County with its policies and procedures on confidentiality. The County may require changes to such policies and procedures as they apply to this agreement, whenever the County reasonably determines that changes are necessary to prevent unauthorized disclosures. The Contractor shall make the changes within the time period specified by the County. Upon request, the Contractor shall immediately return to the County any Confidential Information that the County reasonably determines has not been adequately protected by the Contractor against unauthorized disclosure.

C.  The Contractor shall notify the County within five (5) working days of any unauthorized use or disclosure of a Confidential Information and shall take necessary steps to mitigate the harmful effects of such use or disclosure.

8.  **Conflicts of Interest:** Subrecipients shall provide a copy of their Conflict-of-Interest Statement/Policy prior to their first billing being paid. In addition, Subrecipients shall assure compliance with any applicable State or Federal laws relating to Conflicts of Interest.

9.  **Debarment Certification:** The Contractor, by signature to this Contract, certifies the Contractor, its Principals and any Subrecipients are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded by any Federal department or agency from participating in transactions (debarred). The Contractor also agrees to include the above language notification requirement in any and all Subcontracts into which it enters. The Contractor shall immediately notify the County if, during the term of this Contract, the Contractor, its Principals or Subrecipients becomes debarred. The County may immediately terminate this Contract by providing the Contractor written notice if the Contractor becomes debarred during the term of this Contract.

10. **Disputes:** A Dispute Board shall determine disputes between the parties in the following manner: Each party shall appoint one member to the Dispute Board. The members appointed shall jointly appoint an additional member to the Dispute Board. The Dispute Board shall review the facts, Contract terms, and applicable statutes and rules and make a determination. This process shall constitute the final administrative remedy available to the parties. Each party reserves the right to litigate issues and matters in court de novo.

11. **Entire Contract:** This Contract including all documents attached to or incorporated by reference; contain all the terms and conditions agreed upon by the parties. No other understandings or representations, oral or otherwise, regarding the subject matter of this Contract shall be deemed to exist or bind the parties.

12. **Governing Law, Venue, and Jurisdiction:** This Agreement shall be governed by the laws of the State of Washington. Any action, suit, or judicial proceeding for the enforcement of this Agreement shall be brought in Yakima County Superior Court for the State of Washington.

Docusign Envelope ID: 35557FE0-93B1-4738-B19D-DC0BB2C8B2ED
Case 1:24-cv-03189-MKD    ECF No. 4-2    filed 11/21/24    PageID.53    Page 17 of 60

YN-EWWS-2025

13. **Independent Status:** For purposes of this Contract, the Contractor acknowledges that the Contractor is not an officer, employee, or agent of the County. The Contractor shall not hold out itself or any of its employees as, nor claim status as, an officer, employee, or agent of the County. The Contractor shall not claim for itself or its employees any rights, privileges, or benefits, which would accrue to an employee of the County. The Contractor shall indemnify and hold harmless the County from all obligations to pay or withhold federal or state taxes or contributions on behalf of the Contractor or the Contractor's employees.

The parties agree that, for the purposes of this Contract, the Contractor is an independent contractor and neither the Contractor nor any employee of the Contractor is an employee of the County. Neither the Contractor nor any employee of the Contractor is entitled to any benefits that Yakima County provides its employees. The Contractor is solely responsible for payment of any statutory workers compensation or employer's liability insurance as required by state law.

14. **Inspection:** Either party may request reasonable access to the other party's records and place of business for the limited purpose of monitoring, auditing, and evaluating the other party's compliance with this Contract and applicable laws and regulations. During the term of this Contract and for one year following termination or expiration of this Contract, upon receiving reasonable written notice, the parties shall provide the other party with access to its place of business and to its records, which are relevant to its compliance with this Contract, and applicable laws and regulations. This provision shall not be construed to give either party access to the other party's records and place of business for any other purpose. Nothing herein shall be construed to authorize either party to possess or copy records of the other party.

15. **Indemnification, Defense, and Hold Harmless:** To the fullest extent permitted by law including RCW 4.24.115, the Contractor shall indemnify, defend, and hold harmless the County and its officers, employees, agents, and volunteers from all claims, suits, or actions brought for injuries to, or death of, any persons, or damages arising from or relating to the Contractor's performance of this Agreement or in consequence of any negligence or breach of contract related to the Contractor's performance of this Agreement caused in whole or in part by any act or omission by the Contractor or the agents or employees of the Contractor related to performance of this Agreement.

16. **Contractor's Waiver of Employer's Immunity under Title 51 RCW:** Contractor intends that its obligations to indemnify, defend, and hold harmless set forth above in section 16 shall operate with full effect regardless of any provision to the contrary in Title 51 RCW, Washington's Industrial Insurance Act. Accordingly, the Contractor specifically assumes all potential liability for actions brought by employees of the Contractor against the County and its officers, employees, agents, and volunteers, and, solely for the purpose of enforcing the Contractor's obligations to indemnify, defend, and hold harmless set forth above in section 16, the Contractor specifically waives any immunity granted under the state industrial insurance law, Title 51 RCW. The parties have mutually negotiated this waiver. The Contractor shall similarly require that any subcontractor it retains in connection with its performance of this Agreement shall comply with the terms of this paragraph, waive any immunity granted under Title 51 RCW, and assume all liability for actions brought by employees of the subcontractor.

Docusign Envelope ID: 365577E0-93B1-4738-B19D-DC0BB2C8B2ED

YN-EWWS-2025

17. **Insurance:**

   A. The County certifies that it is insured as a member of the Washington Counties Risk Pool, and is otherwise self-insured, and can pay for losses for which it is found liable.

   B. The Contractor shall, with insurance carriers with a Best Rating of A-VII or better, maintain occurrence based comprehensive general liability insurance and automobile liability insurance with minimum limits of $2,000,000 per occurrence and $5,000,000 aggregate, as well as Workers Compensation Contingent Employers Liability with minimum limits of $1,000,000 each accident or disease for each employee. Such insurance shall provide that Yakima County, its officers, employees, agents, and volunteers are Primary Additional Insureds under such insurance. The coverage provided under such insurance for such Primary Additional Insureds shall be primary and not contributory to any other coverage that may be available to such Primary Additional Insureds. Prior to commencement of any work under this Agreement, the Contractor shall, provide proof of such insurance including all Certificates of Insurance and endorsements pertaining to such insurance, and if requested, any policy pertaining to insurance required under this Agreement.

18. **Maintenance of Records:** During the term of this Contract and per state law for seven years following termination or expiration of this Contract, both parties shall maintain records sufficient to:

   A. Document performance of all acts required by law, regulation, or this Contract.

   B. Demonstrate accounting procedures, practices, and records that sufficiently and properly document the Contractor's invoices to the County and all expenditures made by the Contractor to perform as required by this Contract.

   C. For the same period, the Contractor shall maintain records sufficient to substantiate the Contractor's statement of its organization's structure, tax status, capabilities, and performance.

   D. HMIS Documentation: The Contractor must maintain records relating to this grant for a period of six years following the date of final payment. Paper records derived from HMIS which contain personally identifying information must be destroyed within seven years after the last day the household received services from the lead/subgrantee

19. **Nondiscrimination:** The Contractor agrees that it shall not discriminate against any person on the grounds of race, creed, color, religion, national origin, sex, sexual orientation, veteran status, pregnancy, age, marital status, political affiliation or belief, or the presence of any sensory, mental or physical handicap in violation of the Washington State Law Against Discrimination (RCW chapter 49.60) or the Americans with Disabilities Act (42 U.S.C. 12101 et seq.) or any other applicable state, federal or local law, rule or regulation.

The Contractor and subcontractor shall abide by the requirements of 41 CFR §§ 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals on the basis of protected veteran status or disability and require affirmative action by covered

prime contractors and subcontractors to employ and advance in employment qualified protected veterans and individuals with disabilities.

20. **Order of Precedence:**  In the event of an inconsistency in this Contract, unless otherwise provided herein, the inconsistency shall be resolved by giving precedence, in the following order, to:

    A.    Applicable federal and State of Washington statutes and regulations.
    B.    Washington State Department of Commerce most updated CHG guidelines.
    C.    Special Terms and Conditions of this Contract.
    D.    This Contract.

21. **Ownership of Material:** Copyright in all material created by the Contractor and paid for by the County shall be the property of the State of Washington.  Both County and Contractor may use these materials and permit others to use them, for any purpose consistent with their respective missions as part of the State of Washington.  This material includes but is not limited to books; computer programs; documents; films; pamphlets; reports; sound reproductions; studies; surveys; tapes; and/or training materials. Material which the Contractor uses to perform this Agreement but is not created for or paid for by the County is owned by the Contractor or such other party as determined by Copyright Law and/or Contractor's internal policies.  Contractor hereby grants the County a perpetual license to use this material for County internal purposes at no charge to the County, provided that such license shall be limited to the extent which the Contactor has a right to grant such a license.

22. **Responsibility:** Each party to this Contract shall be responsible for the negligence of its officers, employees, and agents in the performance of this Contract to the extent allowed by law. No party to this Contract shall be responsible for the acts and/or omissions of entities or individuals not party to this Contract. The County and the Contractor shall cooperate in the defense of tort lawsuits, when possible. Both parties agree and understand that this provision may not be feasible in all circumstances. The County and the Contractor agree to notify the attorneys of record in any tort lawsuit where both are parties if either the County or the Contractor enters into settlement negotiations. It is understood that the notice shall occur prior to any negotiations, or as soon as possible, and the notice may be either written or oral.

23. **Severability:** The provisions of this Contract are severable. If any court holds any provision of this Contract, including any provision of any document incorporated by reference, invalid, that invalidity shall not affect the other provisions of this Contract.

24. **Subcontracting:**  The Contractor may not subcontract the services to be provided under this Contract, unless requested and approved in writing by the Director of the Department of Human Services or his assigns or unless otherwise specified in this Contract. If the County, the Contractor, and a subrecipient of the Contractor are found by a jury or trier of fact to be jointly and severally liable for personal injury damages arising from any act or omission from the contract, then the County shall be responsible for its proportionate share, and the Contractor shall be responsible for its proportionate share. Should the subrecipient be unable to satisfy its joint and several liability, the County and the Contractor shall share in the subrecipient's unsatisfied proportionate share in direct proportion to the respective percentage of their fault as found by the jury or trier of fact, to

the extent allowed by law. Nothing in this term shall be construed as creating a right or remedy of any kind or nature in any person or party other than the County and the Contractor. This term shall not apply in the event of a settlement by either the County or the Contractor.

25. **Reporting Requirements:**

A.  Homeless Management Information System (HMIS)

The Contractor shall enter data into the County Homeless Management Information System (HMIS) for every client served under this Agreement in accordance with HUD/HMIS Data Standards. HMIS required data elements are determined by the funder. HMIS data entry must be complete monthly no later than the 5th of the following month. Complete HMIS data entry includes:

- entering/updating project client/household data in HMIS within 14 calendar days following the date of project enrollment/exit.
- Client data entered into HMIS no less frequently than weekly.

If the Contractor fails to enter their HMIS data, the County reserves the right to withhold reimbursement until the data entry is completed. In such cases, withheld payments will be processed in the next month's check run, assuming the data entry is subsequently completed.

The Contractor shall utilize the HMIS housing inventory tool to manage the occupancy of units and update unit information as occupancy, or housing inventory changes. All unit information shall be updated within forty-eight (48) hours of an occupancy change and include notification to the grant manager. Contractor staff that are responsible for maintaining and/or updating the housing inventory shall attend offered training on the use and operation of the HMIS-based housing tool and will respond promptly to questions regarding housing inventory posed by the County. Guidance regarding the information needed to accurately account for housing inventory for the annual submission of the Housing Inventory Count Report and for local planning purposes can be found in HUD Notice CPD-16-060, pp. 5-17 as incorporated herein by reference.

The Contractor shall ensure that all applicable staff are fully trained and certified to operate the current prioritization tools as required by local, state, or federal Coordinated Entry guidelines (i.e., HENA & YAHA) prior to using these systems. Contractors providing permanent supportive housing and transitional housing programs will complete a vulnerability assessment on all program participants at program entry, program exit, and if applicable, annually.

County HMIS staff will post the most current versions of all applicable documents, reports, and operational guidelines to www.yakimacounty.us. Communications regarding updates to the website will be distributed via e-mail to contracted HMIS agencies. The Contractor will submit questions regarding participation in the HMIS, including data collection responsibilities, via the support request tool in the HMIS.

B.  Other Reporting Requirements

The Contractor shall submit data required for the Annual Homeless Assessment Report, Commerce Annual Report, Housing Inventory Count, the Annual Point-in-Time Count,

Quarterly Data Quality Reports, and the System Performance Measures Report as specified by
the County. The Contractor also agrees to submit any additional data from HMIS related to the
funded program upon request.

The Contractor shall be responsible for providing reports to the County on a regular basis
throughout the term of this Contract. Such reports shall include, but not be limited to,
performance measures and outcomes identified in Exhibit A.

The County may require monthly reports; however, in such cases, the County shall provide the
Contractor with at least 45 days' notice prior to the commencement of monthly reporting. In
addition to the monthly reports, the County reserves the right to request ad hoc reports as
needed, to monitor and assess performance or address specific concerns.

26. **Contract Management Standards:** The Contractor shall maintain accurate records to account
for its expenditures and program performance. The County has the right to monitor and audit
the finances of the Contractor to ensure actual expenditures remain consistent with the spirit and
intent of this Agreement. The County designee may inspect and audit all records and other
materials and the Contractor shall make such available upon request.

27. **Internal Auditing Controls:** The Contractor shall establish and maintain a system of internal
accounting control which complies with applicable Generally Accepted Accounting Principles
(GAAP). All Contractor records with respect to any matters covered by this Agreement shall
be made available to the County, or other authorized officials, at any time during normal
business hours, as often as deemed necessary, to audit, examine, and make excerpts or
transcripts of all relevant data.

The Contractor must send a copy of its audit report, corrective action plan for any audit
finding(s), and Management Letter to the County's Contract Representative, designated on the
Face Sheet of this Agreement within the earlier of thirty (30) days after receipt of the auditor's
report, or no later than nine (9) months after the end of the audit period. Corrective action plans
are to be submitted for all findings and Management Letters, not only those related to funding
received from the County. The annual audit must include a management letter that addresses the
adequacy of internal controls within the organization.

If this Agreement is funded by Federal sources as identified on the FACE SHEET, the
Contractor shall comply with Federal audit requirements for agencies who expend in excess of
$750,000 of federal funds. The County reserves the right to require special procedures which
are more limited in scope than a full audit for those agencies expending less than $750,000 in
federal funds.

The Contractor that expends less than $750,000 in a fiscal year in federal funds from all sources
shall submit a copy of the Contractor's most recent Audited Financial Statement to the County's
Contract Representative, designated on the Face Sheet of this Agreement. The Contractor that
does not receive a financial audit shall submit financial statements within ninety (90) calendar
days of Contractor's fiscal year end to the County's Contract Representative by mail.

The Contractor is responsible for any audit expenses incurred by its own organization or that of
its Subcontractors and the County reserves the right to recover from the Contractor all
disallowed costs resulting from the audit.

Failure of the Contractor to comply with the audit requirements will constitute a violation of this Agreement and may result in the withholding of future payments.

28.  **Religious Activities:** The Contractor acknowledges no portion of the public funds shall be appropriated for or applied to any religious activity or essentially religious endeavors, including but not limited to religious worship, exercise or instruction.

The Contractor acknowledges that government-paid staff is prohibited from conducting religious activities during their on-duty grant funded hours.

ALL participation in religious activities by clients must be purely voluntary.  Religious activities should be conducted in a place and in a manner that allows clients to opt in (such as going to a room or space separate from the main facility) and that does not stigmatize those who elect not to participate.

No homeless services provided by the Contractor shall be denied due to person's religious affiliation or lack thereof.

29.  **Survivability:** The terms and conditions contained in this Contract, which by their sense and context, are intended to survive the expiration of this particular Contract shall survive. Surviving terms include, but are not limited to Confidentiality, Disputes, Inspection, Maintenance of Records, Ownership of Material, Responsibility, Termination for Default, Termination Procedure, and Title to Property.

30.  **Termination Due to Change in Funding:**  If the funds upon which the County relied to establish this Contract are withdrawn, reduced, or limited, or if additional or modified conditions are placed on such funding, the County may terminate this Contract by providing at least five business days written notice to the Contractor. The termination shall be effective on the date specified in the notice of termination.

31.  **Alternative use of Funding:** Yakima County at its sole discretion may choose to provide alternative funding sources to continue this contract if the original funds which the County relied to establish this Contract are withdrawn, reduced, or limited, or if additional or modified conditions are placed on such funding.  Such decision to use alternative funding sources shall not abrogate Yakima County's right to terminate this contract under the provisions set forth in item 30 above, and such decision to provide and/or continue such alternative funding shall be at the sole discretion of Yakima County and the contractor agrees to hold Yakima County harmless for such decision.

32.  **Suspension or Termination:**

The County may suspend or terminate this Agreement if the Contractor materially fails to comply with any terms or this Agreement, which included but are not limited to the following:

A.  Failure to comply with the rules, regulations or provisions referred to herein, or such statutes, regulations, executive orders, policies, or directives as may become applicable at any time; and

B.  Failure, for any reason, of the Contractor to fulfill in a timely and proper manner its obligations under this Agreement; and

C.  Ineffective or improper use of funds provided under this Agreement; and/or

    D.    Submission by the Contractor to the County reports that are incorrect or incomplete in any material respect.

Either party may terminate this Agreement by providing thirty (30) calendar days written notice sent by certified mail to the addresses listed on the Face Sheet.

If this Agreement is terminated for any reason, County shall pay only for performance rendered or costs incurred in accordance with the terms of this Agreement and prior to the effective date of termination.

The County reserves the right to terminate the contract immediately effective upon receipt of written notice to Contractor for any alleged material breach of the contract which may include alleged violations of Washington or Federal Law, and/or any other violation of the terms of this agreement that would materially frustrate the purpose of this contract and/or subject Yakima County to potential financial and/or tort liability.

33.    **Title to Property:** Title to all property purchased or furnished by the County for use by the Contractor during the term of this Contract shall remain with the County. Title to all property purchased or furnished by the Contractor for which the Contractor is entitled to reimbursement by the County under this Contract shall pass to and vest in the County. The Contractor shall take reasonable steps to protect and maintain all the County property in its possession against loss or damage and shall return the County property to the County upon Contract termination or expiration, reasonable wear and tear excepted.

34.    **Treatment of Client Property:** Unless otherwise provided in this Contract, the Contractor shall ensure that any adult client receiving services from the Contractor under this Contract has unrestricted access to the client's personal property. The Contractor shall not interfere with any adult client's ownership, possession, or use of the client's property.

The Contractor shall provide clients under age 18 with reasonable access to their personal property that is appropriate to the client's age, development, and needs. Upon termination or completion of this Contract, the Contractor shall promptly release to the client and/or the client's guardian or custodian all of the client's personal property. This section does not prohibit the Contractor from implementing such lawful and reasonable policies, procedures and practices as the Contractor deems necessary for safe, appropriate, and effective service delivery (for example, appropriately restricting clients' access to, or possession or use of, lawful or unlawful weapons and drugs).

35.    **Waiver:** Waiver of any breach or default on any occasion shall not be deemed a waiver of any subsequent breach or default. Any waiver shall not be construed to be a modification of the terms and conditions of this Contract unless amended as set forth in Section 2, Amendment. Only the Director or designee has the authority to waive any term or condition of this Contract on behalf of the County.

36.    **Notices:** Any demand, request or notice which either party desires or may be required to make or deliver to the other shall be in writing and shall be deemed delivered when personally delivered, or when delivered by private courier service (such as Federal Express), or three days after being deposited in the United States mail, in registered or certified format, return receipt requested, addressed to the representatives as identified on the Face Sheet of this agreement.

# EXHIBIT A

## SPECIAL TERMS & PERFORMANCE MEASURES

1. **Purpose of the Agreement:** Provide comprehensive low barrier emergency shelter services, which encompass not only immediate shelter but also robust case management support. The primary goal is to assist individuals experiencing homelessness in resolving their housing instability by offering personalized case management services. Through this approach, we aim to empower individuals to address underlying challenges and access necessary resources, thereby facilitating their transition from homelessness to sustainable housing solutions

2. **Program Delivery:**
The Contractor agrees to provide the following program services:

| | |
|---|---|
| Project Description: | Emergency Shelter |
| Project Type: | ES |
| HMIS Project Name | YINIniitnu't Seasonal ES |
| HMIS Project Start Date | 2024-05-03 |
| HMIS Project Type Code: | Emergency Shelter – Entry Exit |
| Low Barrier Project: | Yes |
| Project Capacity: | 50 – 25 Males/25 Females |
| Projected # of Households Served: | 150 per year |

| Population Served | |
|---|---|
| X | Single Men + Single Women |
| | Single Men Only |
| | Single Women Only |
| | Single Women + Households with Children |
| | Households with Children |
| | Young Adults |

3. **Key Activities:** Comprehensive Low Barrier Emergency Shelter Services, which encompass not only immediate shelter but also robust case management support as defined by the budget below.

4. **Organizational Performance Measures**

   A.    REQUIRED HOUSING OUTCOME PERFORMANCE MEASURES - Grantees are required to provide quality data to the best of their ability. Maintaining good data quality is important for effective program evaluation. Data quality has four elements: completeness, timeliness, accuracy, and consistency.

| Expected Completeness Measures | | | | |
|---|---|---|---|---|
| Data Element | Emergency Shelter | Night-by-Night/Drop-in Emergency Shelter | All other Housing Project Types | Street Outreach |
| Name* | 85% | 80% | 95% | 90% |
| Date of Birth* | 85% | 80% | 95% | 90% |
| Race and Ethnicity* | 85% | 80% | 95% | 90% |
| Prior Living Situation | 85% | 80% | 100% | 85% |
| Destination | 80% | 50% | 95% | 50% |

*Only measured for consenting clients

B.  Program Performance Measures (Based On Contract Type)

| Intervention Type | Performance Measure | HMIS Calculation | Performance Target |
|---|---|---|---|
| Drop In Emergency Shelter | Increase Exits to Positive Outcomes | Of people in ES who exited, those who exited to positive outcome destinations | Target 50% |
| Emergency Shelter (ES) | Increase to Exits to Permanent Housing | Of people in ES who Exited those who exit to permanent housing destinations | Target 50% |
| All of the interventions above | Equitable Outcomes | Each calculation above, disaggregated by race and ethnicity | Outcomes across racial and ethnic demographics should not be significantly less than the overall rate. |

C.  POPULATION ACCOUNTABILITY

A minimum of 60% of services will be provided to unsheltered homeless households or households fleeing domestic violence OR an increase of at least 5% of services will be provided to unsheltered homeless households or households fleeing domestic violence annually.

Program contributes to reduction in homelessness for members of at least one of the following priority populations:

- Individuals and households experiencing unsheltered homelessness.
- Individuals and households fleeing domestic violence.
- Individuals experiencing chronic homelessness.
- Unaccompanied youth
- Veterans
- Families with children
- Individuals over the age of 62 years

D.  PROGRAM ACCOUNTABILITY

- Data is collected and reported accurately.

- Organizational/ Program Leadership will attend Coordinated Entry Policy Meetings a minimum of 9 meetings a year.

- Organizational/Program Case Managers/Client Staff will attend Coordinated Entry Provider Meetings/By Name Case Conferencing meetings a minimum of 9 per year.

- Organizational Data Lead to attend 9 data committee meetings per year.

- Participates in annual stakeholders meeting called by Yakima County Homeless Coalition once per year.

- Additional subcommittees are open to program/leadership participation, Interested participants can visit our website at https://www.yakimacounty.us/2333/Human-Services or contact the Grant Manager.

E.    FISCAL ACCOUNTABILITY

Less than 25% of reimbursement invoices are submitted late (after the 10th of the month) over the length of the contract period.

Less than 25% of reimbursement invoices need to be resubmitted due to clerical errors over the length of the contract period.

**5.    Adherence to State and Federal Anti-Discrimination Laws**

Program must adhere to the following anti-discrimination laws:

A.  Program ensures equal access for people experiencing homelessness regardless of race, national origin, gender identity, sexual orientation, marital status, age, veteran or military status, disability, or the use of an assistance animal.

B.  Programs designed to serve families with children experiencing homelessness ensure equal access regardless of family composition and regardless of the age of a minor child.

C.  Programs that operate gender segregated facilities allow the use of facilities consistent with the person's gender expression or identity.

**6.    Adherence to low-barrier guidelines**

Program must adhere to the following criteria:

A.  Expectations are realistic and clear.

B.  Rules and policies are narrowly focused on maintaining a safe environment and avoiding exits to homelessness.

C.  There are no work or volunteer requirements.

D.  Programs that require households to pay a share of rent allow reasonable flexibility in payment.

E.  Households are not terminated due to failure to participate in supportive services or treatment programs.

F.  Households are not terminated due to failure to make progress on a housing stability plan.

G.  Households are not terminated due to alcohol and/or substance use in and of itself.

**7.    Participation in the Homeless Crisis Response System and Conflict Mediation**

A.  The subgrantee acknowledges and agrees that they are expected to actively participate as a functional member of the Homeless Crisis Response System, working collaboratively with other agencies involved in the system. This participation includes but is not limited to sharing information, coordinating services, attending meetings, and engaging in joint planning efforts. The subgrantee shall adhere to the established protocols, guidelines, and processes of the Homeless Crisis Response System as determined by Yakima County.

B.  In the event of conflicts arising between the subgrantee and other participating agencies within the Homeless Crisis Response System, the subgrantee shall be responsible for initiating and attending conflict mediation sessions. The subgrantee shall bear the financial responsibility for any costs associated with conflict mediation, including but not limited to mediator fees, venue charges, and travel expenses.

C. Yakima County reserves the right to intervene in conflict mediation proceedings between the subgrantee and other participating agencies, as deemed necessary and appropriate by Yakima County. Such intervention may involve direct involvement in the mediation process, providing guidance, or facilitating resolution discussions. Yakima County shall have the authority to make decisions or impose recommendations based on the best interests of the Homeless Crisis Response System and the overall objectives of the contract.

D. The subgrantee agrees to cooperate fully and in good faith during conflict mediation processes, including sharing relevant information, attending scheduled sessions, and actively participating in finding mutually agreeable resolutions. The subgrantee shall provide updates and progress reports to Yakima County regarding the status and outcomes of conflict mediation efforts.

E. Failure to comply with the stipulations outlined in this agreement regarding participation in the Homeless Crisis Response System and conflict mediation may result in penalties, including but not limited to the termination of the contract, reduction of funding, or other remedies deemed appropriate by Yakima County.

**8. CHG Guidelines and regulations.**

A. The contractor agrees to follow the most updated version of Washington State Department of Commerce's Consolidated Homeless Grant (CHG) guidelines. The most current guidelines at the time of this contract issuance can be found here: https://www.commerce.wa.gov/serving-communities/homelessness/consolidated-homeless-grant/

**9. Illegal Drug Use Policy**

A. Contractors agree they will have policies and procedures prohibiting use of illegal drugs and alcohol on-site at Yakima County funded programs. Contractor will have a policy in place on actions to be taken if a client is found to be in violation of this policy. Contractor shall take safeguards to ensure that no minors consume or are in possession of any illegal drug, or non-prescription drug, and/or alcoholic beverage. Policies and procedures will be submitted to Yakima County Human Services department.

**10. Hotel and Motel Vouchers**

A. No hotel or motel vouchers will be issued to clients until after verifying and documenting there is no availability at any other low barrier shelter, except in the case of a domestic violence situation.

# EXHIBIT B

# BUDGET

GRANTEE is authorized to spend no more than **TWO-HUNDRED AND FIFTY THOUSAND AND 00/100 DOLLARS ($250,000) FROM July 1st, 2024 through June 30th, 2025**.

| Category | Amount |
|---|---|
| **Year 1: 7/1/2024 – 6/30/2025** | |
| Operations | $250,000 |
| **TOTAL YEAR 1** | **$250,000** |
| ***Year 2: 7/1/2025 – 6/30/2026*** | |
| Operations | $200,000 |
| **TOTAL YEAR 2** | **$200,000** |
| **TOTAL:** | **$450,000** |

*The parties agree that the budgeted year 2 amounts stated in the table above are fully contingent upon Yakima County receiving the current same level of funding from the Washington State Department of Commerce and local filing fees. In regard to the total Year 2 figures, and Total Figure listed above, in the event that funding relied on to support this funding is changed, reduced, and/or eliminated, Grantee agrees to hold Yakima County harmless from contractual liability for payment of year two as listed above.

If contractor has more than one project listed, the budgets for those projects remain distinct and must be separable; each project line is also required to be invoiced and supported separately.

1. Administrative (Indirect) Costs:
   A. The Contractor may use a total of 6% for administrative (indirect) costs for projects funded with Yakima County 2163 funds or that align with the Consolidated Homeless Grant Guidelines issued by the Washington State Department of Commerce.

   B. Contractors will spend administration costs at the same rate proportionally to their non-administrative costs. The percentage of administrative (indirect) costs spent will not exceed 10% of the percentage of non-administrative costs spent. (ie: if the budget for operational costs are 20%

spent, administrative costs may not exceed 30% of the administrative budget).

2. Non-Admin Expenses (Operations)

   A. Operation expenses will be deemed allowable as determined by the CHG guidelines. The sub-grantee will not be allowed to submit expenses for reimbursement for items not listed on the initial RFP application unless prior approved by Yakima County Human Services Finance Manager. Yakima County reserves the right to assign a more detailed line-item budget to sub-grantees that matches the initial RFP application. Request for line-item adjustments must be submitted through email to the Finance Manager

3. Payment Procedures:
   A. Requests for reimbursement by the Contractor shall be submitted no more than once per month using the invoice form provided by the County.

   B. At the Contractor's first request for reimbursement, Yakima County Human Services will require detailed back-up documentation for all expenditures. On subsequent invoices, the monthly activity report and a printout from the Contractor's accounting system listing the expenditures charged against the contract will be acceptable. All back-up documentation must be available to the County and all other auditors, upon request. Reimbursement of expenditures for staff time spent on more than one source will require timesheets reflecting hours charged to the contract.

   C. Monthly invoices and documentation must be submitted as follows:

      • Electronically: Submitted electronic invoices must be provided to your Fiscal Contract Representative contact designated on the Face Sheet of this agreement at the Yakima County Human Services Department. Electronic invoices must be submitted no later than the 10th of the month. If the 10th falls on a Saturday, invoices must be received by close of business the preceding Friday. If the 10th falls on a Sunday, invoices must be received by close of business the following Monday. For expenses incurred during the month of June, the reimbursement request shall be submitted on or before the 6thth of July.

      • Original invoice via delivery: Upon request, a signed original hard copy of the invoice must be submitted to Human Services The signed original invoice must be received no later than the 10th of the month to be paid on the County's next scheduled warrant date at the following address:

Docusign Envelope ID: 365577E0-93B1-4728-B19D-DC0BB2C8B2ED

YN-EWWS-2025

Yakima County Human Services
223 N. 1st Street
Yakima, WA 98901

D. All late invoices will not be paid until the following month; The decision to approve or deny payment of claims for services submitted more than 60 days after the end of the end of the invoice period shall rest solely with the Human Services Director; the Director's decision shall be final and not capable of right to appeal.

E. Submitted invoices must explicitly allocate costs by contracted line items. The Contractor is responsible for ensuring submitted cost documentation is clearly associated with contracted line items. Invoices not meeting this requirement will be returned for correction (All submission deadlines still apply to invoices in need of correction).

F. Invoices must be submitted with appropriate supporting documentation, including copies of receipts, as well as invoices and time and effort tracking as directed by the County's Fiscal Contact as designated of the Face Sheet of this agreement.

G. Submitted costs ineligible for reimbursement or not properly supported will be deducted from the Contractor's reimbursement. Contractor will be provided a summary of deductions and may opt to submit a supplemental invoice providing additional documentation before the next month's invoicing deadline for these costs only. Should a contractor opt not to re-invoice, these costs will be considered void as of the close of the next invoicing period.

H. The Contractor shall submit reimbursement requests for meals to program clients as part of this agreement. The Contractor agrees that in order to maximize use of available funds to serve the public regarding this service that it shall exercise prudent judgment in selection of meal service providers. Such meal reimbursement shall at no time be higher than $7 per meal per member of the public served. Such receipts must be itemized, and such reimbursement form must include the total number of members of the public serviced, and reason for the event. Bulk raw food ingredients must also be itemized but are not required to be tied to total number of members of the public serviced.

I. Unless otherwise restricted by funding authorities, Contractor may request a budget line item be adjusted by up to 10% of the total annual amount between line items without a contract modification. This request must be made in writing, is subject to approval by the Yakima County Human Services

Director and shall not be construed to allow any modification contrary to other contract requirements in the General Terms, Special Terms, or referenced contractual documents.

J. All program or billing related questions must be submitted to your agency's designated program manager directly at the Yakima County Human Services Department.

Docusign Envelope ID: 365577E0-93B1-4738-B19D-DC0BB2C8B2ED

# ACORD®
## CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
11/07/2023

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | Melanie Van Gelder | | |
|---|---|---|---|---|
| Brown & Brown of Washington, Inc. | PHONE (A/C, No, Ext): | (206) 956-1600 | FAX (A/C, No): | (206) 956-9600 |
| 701 Fifth Ave Ste 550 | E-MAIL ADDRESS: | Melanie.VanGelder@bbrown.com | | |
| | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| Seattle                    WA  98104 | INSURER A : | Hudson Insurance Company | | |
| **INSURED** | INSURER B : | | | |
| Confederated Tribes and Bands of the Yakama Nation | INSURER C : | | | |
| Village of Hope | INSURER D : | | | |
| PO Box 151 (401 Fort Road) | INSURER E : | | | |
| Toppenish                    WA  98948 | INSURER F : | | | |

| COVERAGES | CERTIFICATE NUMBER: Village of Hope | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **COMMERCIAL GENERAL LIABILITY** [ ] CLAIMS-MADE [X] OCCUR | | Y | NACL00417-16 | 10/01/2023 | 10/01/2024 | EACH OCCURRENCE | $ 6,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 250,000 |
| | | | | | | | MED EXP (Any one person) | $ Excluded |
| | | | | | | | PERSONAL & ADV INJURY | $ Included |
| | GEN'L AGGREGATE LIMIT APPLIES PER: [X] POLICY [ ] PRO-JECT [ ] LOC OTHER: | | | | | | GENERAL AGGREGATE | $ 10,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 7,000,000 |
| | | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** [X] ANY AUTO [ ] OWNED AUTOS ONLY [ ] SCHEDULED AUTOS [ ] HIRED AUTOS ONLY [ ] NON-OWNED AUTOS ONLY | | | NACL00417-16 | 10/01/2023 | 10/01/2024 | COMBINED SINGLE LIMIT (Ea accident) | $ 5,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | [ ] **UMBRELLA LIAB** [ ] OCCUR [ ] **EXCESS LIAB** [ ] CLAIMS-MADE | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | AGGREGATE | $ |
| | [ ] DED [ ] RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N / A | | | | | [ ] PER STATUTE [ ] OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

RE: Emergency winter weather shelter contract.

Yakima County Human Services is an additional insured as required by written contract and/or agreement with the named insured.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Yakima County Human Services 223 N 1st Street Yakima                    WA  98901 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD

# EXHIBIT D - UNIFORM GUIDANCE

## Uniform Guidance Subrecipient Compliance Confirmation

**TO: HHAP Subgrantee**

**RE: Uniform Guidance Subrecipient Compliance Confirmation FY 2023**

The Federal Office of Management and Budget requires prime recipients of Federal funds to monitor sub-awards to subrecipients for compliance with the requirements of Uniform Guidance, *Audits of Institutions of Higher Education and Other Nonprofit Institutions.* **Yakima County is extending this policy to subrecipients of non-federal funds subcontracted as well.** We are requesting certification that your organization is in compliance with the Uniform Guidance. Accordingly, please check the appropriate box below and return with a copy of your audit, if required.

____ Our Single Audit has been completed. We certify that for the period of _____ to _____, 2023 there were no material weaknesses, instances of material non-compliances or findings related to any sub-awards with Washington State University for this period and no corrective actions were required; therefore, we are not enclosing a copy of the report.

____ Our Single Audit for the period _____ to _____ included exceptions. **A copy of the audit report, including the exceptions and our responses, is enclosed.**

_X_ Our Single Audit report is not yet complete. We expect that the report and institutional response (if necessary) will be completed by _January 2025_____. Upon completion, we will provide written notification and, if material findings are reported, a copy of our audit report along with a corrective action plan.

____ We are not subject to the audit requirements of the Uniform Guidance because we expended less than $ 750,000 in federal funds during the related fiscal year. **(Please complete page 2.)**

____ Other -- We are not subject to the Single Audit requirements because: **(Please complete page 2.)**
— Our organization is for profit (fill in page 2).
— Other (explain) _____
(fill in page 2)

*I certify that the above-marked information accurately represents the organization of which I am a representative. Furthermore, I hereby certify that all relevant materials findings in the audit report, if completed, have been disclosed.*

Signature: _Stacy McKay_____ Title: _Chief Financial Officer_____ Date: _7/25/2024 | 2:39 PM PDT_

Name: _Stacy A. McKay_____ Phone: _509-865-5121_ Email: _Stacy_McKay@yakama.com_

Organization Name:_Confederated Tribes and Bands of the Yakama Nation_____

Address: _PO Box 151, 401 Fort Road_____

City/State/Zip Code: :_Toppenish, WA 98948_____

Website address of audit report or financial statements: _N/A_____

**EXHIBIT C**

Declaration of Ethan Jones in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction

**Confederated Tribes and Bands
Of the Yakama Nation**

**Established by the
Treaty of June 9, 1855**

**R E S O L U T I O N**                    **T-010-25**

**WHEREAS,** the Confederated Tribes and Bands of the Yakama Nation is a federally recognized Nation pursuant to the Treaty of 1855 (12 Stat. 951), and

**WHEREAS,** the Yakama Tribal Council is the governing body of the Confederated Tribes and Bands of the Yakama Nation by the authority delegated by the Resolution of February 1944 and Resolution T-38-56, and

**WHEREAS,** the Yakama Tribal Council has the duty and responsibility according to the Resolutions T-38-56 and T-10-61 to protect and preserve the Treaty Rights of the Yakama Nation, and

**WHEREAS,** Article II of the Treaty of 1855 states that the Yakama Reservation "shall be set apart, and, so far as necessary, surveyed and marked out, for the exclusive use and benefit of said confederated tribes and bands of Indians, as an Indian reservation . . ."; and

**WHEREAS,** the Yakama Nation is dedicated to administering government programs that serve enrolled Yakama Members in a culturally and religiously appropriate manner including the Village of Hope of which provides temporary housing services to enrolled Yakama Members and their families through the transitional housing program and seasonal weather shelters; and

**WHEREAS,** plummeting temperatures and life-threatening winter conditions endanger unhoused Yakama Members and their families and thereby threatens the health and welfare of the Yakama Nation and our Members; and

**WHEREAS,** the Yakima Valley Farm Workers Clinic has agreed to lend its facilities located in Toppenish within the Yakama Reservation to the Village of Hope for the purpose of a cold weather shelter.

**NOW, THEREFORE, BE IT RESOLVED,** by the Yakama Tribal Council meeting in a Regular Session at the Governmental Headquarters of the Confederated Tribes and Bands of the Yakama Nation, with a quorum being present, declare that the Yakama Nation must be able to operate a cold weather shelter to protect against the threat that dangerously cold weather poses to the health and welfare of our unhoused enrolled Members, and by extension the Yakama Nation.

**BE IT FURTHER RESOLVED,** that the Village of Hope is authorized to enter into an agreement with the Farm Worker's Clinic to provide a cold weather shelter for the winter of 2024-2025.

**BE IT FURTHER RESOLVED,** that the Yakama Nation Tribal Council authorizes the Yakama Nation Office of Legal Counsel to take any and all necessary steps, including but not limited to legal action in state and/or federal courts, to support the Village of Hope's cold weather shelter for the winter of 2024-2025.

**BE IT FINALLY RESOLVED,** that the Yakama Nation does not waive, alter, or otherwise diminish our Sovereign Immunity, whether expressed or implied, by virtue of this resolution for any and all administrative or legal action, which may arise directly or indirectly from the same, nor does the Yakama Nation waive, alter, or otherwise diminish our rights, privileges, remedies or services guaranteed by the Treaty of 1855.

Post Office Box 151, Fort Road, Toppenish, WA 98948 (509) 865-5121

**Yakama Tribal Council Resolution**          T-010-25          11/07/2024          Pg. 2

**DONE AND DATED** on this 7th day of November 2024 by the Yakama Nation Tribal Council by a vote of 10 for, 0 against and 0 abstentions.

Gerald Lewis, Chairman
Yakama Tribal Council

**ATTEST:**

Stephen Selam, Secretary
Yakama Tribal Council

Cc:      file
          HEW Ca#30-2025-4

**EXHIBIT D**

Declaration of Ethan Jones in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction



Confederated Tribes and Bands
of the Yakama Nation

Established by the
Treaty of June 9, 1855

November 12, 2024

**Sent via Electronic Mail**

Toppenish City Council
21 W 1st Ave
Toppenish, Washington 98948

      **Re:   Yakama Nation Iniitnu't Cold Weather Shelter**

Dear Toppenish City Council:

I write on behalf of the Confederated Tribes and Bands of the Yakama Nation ("Yakama Nation") to provide notice that the Yakama Nation will be opening the Iniitnu't Cold Weather Shelter in partnership with the Yakima Valley Farmworkers Clinic within the City of Toppenish and the Yakama Reservation. We expect temperatures to drop below freezing this week, so the Iniitnu't Cold Weather Shelter will provide 24-hour emergency shelter services to our Indian and non-Indian unhoused populations to ensure that they have a warm and dry place to survive these extreme weather conditions.

The Yakama Nation is disheartened that we were not able to pursue this Iniitnu't Cold Weather Shelter in partnership with the City of Toppenish. Over the past month, the Yakama Nation has worked with the Toppenish City Council in good faith to resolve the City's concerns related to the proposed operation of the Iniitnu't Cold Weather Shelter. To address the City's concerns with the proposed facility, the Yakama Nation demonstrated that it meets the religious organization exemption under RCW 35A.21.360 and RCW 35A.21.360(6)(c). To meet the City's liability concerns, the Yakama Nation identified RCW 35A.21.360(8) which provides certain liability protections to the City where emergency shelter services are operated by qualified religious organizations. We sent our staff to engage with City of Toppenish staff on any City permitting requirements. The City Council did not formally support or oppose our proposal, and City of Toppenish staff refused to identify permitting requirements that may be applicable to temporary emergency shelter services within city limits. With dangerous temperatures expected this week, we are out of time and must open the Iniitnu't Cold Weather Shelter for our collective community.

We are hopeful that the City of Toppenish will work with the Yakama Nation to make the Iniitnu't Cold Weather Shelter a reality moving forward. We would prefer to be partners in this effort. The unfortunate fact is that RCW 35A.21.360 was enacted by the Washington State Legislature to address local municipalities that attempted to prohibit religious organizations from fulfilling their mission to serve the homeless. *See* RCW 36.01.290 (note 2020 c 223(2)). Under RCW 35A.21.360, a "religious organization" means "the federally

protected practice of a recognized religious assembly, school, or institution that owns or controls real property." RCW 35A.21.360(6)(c). An organization either is or is not a religious organization under this definition; there is no requirement that a local municipality formally recognize an entity as a religious organization before it can open a shelter. The Yakama Nation clearly meets this statutory definition.

The Yakama Nation is a federally recognized Indian Tribe under the Treaty with the Yakamas, June 9, 1855, 12 Stat. 951 ("Treaty of 1855"). Under the Treaty of 1855, the Yakama Nation's ancestors reserved the right to fish, hunt, gather, pasture their horses and cattle, and travel so as to ensure the Yakama Nation can continue our cultural and religious practices. The Yakama Nation maintained our cultural and religious traditions, including our Washat faith. We built and maintain longhouses and shorthouses on lands that we own and reserved by Treaty, where our Members meet weekly to perform religious ceremonies. We operate a school for our Members where we teach our culture and traditions, all of which are inextricably linked to our religion. The Yakama Nation maintains a complex system of government that integrates our Washat faith into our leadership roles, government policy, and program administration. Unlike the City Council, the Yakama Nation is permitted to integrate our government and religious faith because the Indian Civil Rights Act of 1968 recognizes federally recognized tribes as sovereigns that predate the creation of the United States and are therefore not bound by the Establishment Clause of the U.S. Constitution. Congress has further protected Native American religions with the American Indian Religious Freedom Act of which Washat is a protected religion under applicable federal law. We also recognize and support other faiths that are devoutly practiced by our Membership, including Christian-based practices. Whether defined by our recognized religious assemblies, our school, or our religious institution of government that owns real property, the Yakama Nation is a religious organization under RCW 35A.21.360.

Beyond state law that binds the City of Toppenish, the Yakama Nation has every right as a federally recognized Indian Tribe to exercise our sovereignty throughout the Yakama Reservation, including on non-Indian owned fee lands within the City of Toppenish, as necessary to provide for the health and safety of our unhoused Members. The Yakama Nation Tribal Council recently passed a Resolution ordering the opening of our Iniitnu't Cold Weather Shelter. We intend to open this week. We also intend to keep the lines of communication open with the City, and will welcome every opportunity to partner or address the City's concerns. Please reach out to Jenece Howe, program manager, at Jenece_Howe@yakama.com, and Ethan Jones, Yakama Nation Lead Attorney, at (509) 834-8005 or ethan@yakamanation-olc.org.

Sincerely,

*Gerald Lewis*

GERALD LEWIS, CHAIRMAN
YAKAMA NATION TRIBAL COUNCIL

**EXHIBIT E**

Declaration of Ethan Jones in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction

**CITY OF**
**TOPPENISH**

21 West 1st Avenue
Toppenish, WA 98948

November 18, 2024

Yakama Nation
Post Office Box 151
Toppenish, WA 98948

Attn: Jenece Howe, Program Manager
       Ethan Jones, Yakama Nation Lead Attorney

Re:  Iniitnu't Cold Weather Shelter – Letter dated November 12, 2024

Dear Ms. Howe and Mr. Jones:

In response to the letter the City of Toppenish received dated November 12, 2024, from the Yakama Nation Tribal Council, please be advised that the City Council of the City of Toppenish has considered what usage the Yakama Nation may make of the Farm Workers Clinic building located at 508 W. 1st Ave., and the Council agreed that the Farmworkers Clinic Building could be used by the Tribe as a daytime winter warming station, not to exceed **6** hours per day. The concern that the City of Toppenish and City Council had about using the facility more than that was that the Farmworkers Clinic Building has some health and safety code deficiencies, and the City did not want to have people suffer injury from problems that could result because of those deficiencies. If the building's health and safety deficiencies were corrected, we would be dealing with a much easier set of problems to solve.

The Yakama Nation also raises questions regarding whether the Tribe qualifies as a religious organization under RCW 35A.21.360. Perhaps this is one of those issues about which reasonable minds may not always agree, but the City is not confident that the statue applies to the Yakama Nation. If the Tribe is aware of court cases that have interpreted that statute to support the Tribe's position, the City requests that such information be provided.

Otherwise, if representatives of the Tribe were interested in meeting with representatives of the City to discuss these matters further, please let me know. Likewise, if the Tribe is willing to limit its use of the Farmers Clinic Building to not more than **6** hours per day, consistent with its past practice, the City would be supportive of that.

However, again, at this point, use of the building for shelter purposes for longer than **6** hours per day raises concerns on the City's behalf about potential problems stemming from the building's health and safety code deficiencies.

Please let me know if you have any questions in this regard.

Thank you.

Dan Ford, PE – City Manager

Cc:  Andrew Hattori - CED Director
     Heidi Riojas – City Clerk
     File

**EXHIBIT F**

Declaration of Ethan Jones in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction





**Confederated Tribes and Bands**
**of the Yakama Nation**

Established by the
Treaty of June 9, 1855

November 20, 2024

Sent via Electronic Mail

Toppenish City Council
Attn: Dan Ford, City Manager
21 West 1st Avenue
Toppenish, Washington 98948

**Re:     Response to City of Toppenish Letter Dated November 18, 2024 -**
**Yakama Nation Iniitnu't Cold Weather Shelter**

Dear Toppenish City Council,

The Confederated Tribes and Bands of the Yakama Nation ("Yakama Nation") is in receipt of Toppenish City Manager Dan Ford's letter dated November 18, 2024 concerning the Yakama Nation's Iniitnu't Cold Weather Shelter. We appreciate the City's response and willingness to meet with the Yakama Nation on this important issue. Please let us know your availability.

To help us prepare for the meeting, we request a list of the City's health and safety concerns with the building where the Iniitnu't Cold Weather Shelter is operating. With the extreme weather that we experienced last night, the Yakama Nation opened the Shelter this morning on November 20, 2024. Consistent with the Yakama Nation Tribal Council's direction, the Yakama Nation will operate the shelter on a 24-hour basis to ensure the health and safety of our unhoused Yakama Members, who are vital to maintaining the political integrity, economic security, and health and welfare of the Yakama Nation. The Yakama Nation will also provide shelter services to any other community member in need, regardless of enrollment status.

Please contact Mr. Ethan Jones, Lead Attorney for the Yakama Nation Office of Legal Counsel, at (509) 834-8005 or ethan@yakamanation-olc.org to schedule a meeting with the Yakama Nation Tribal Council and Yakama Nation Staff concerning the Yakama Nation's Iniitnu't Cold Weather Shelter.

Sincerely,

*Gerald Lewis*

GERALD LEWIS, CHAIRMAN
YAKAMA NATION TRIBAL COUNCIL

**EXHIBIT G**

Declaration of Ethan Jones in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction

# NATIONAL WEATHER SERVICE
### NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION


Print

**NWS Forecast for: Toppenish WA**
Issued by: National Weather Service Pendleton, OR
<u>Last Update:</u> 8:31 am PST Nov 21, 2024

| Today | Tonight | Friday | Friday Night | Saturday | Saturday Night | Sunday | Sunday Night | Monday |
|---|---|---|---|---|---|---|---|---|
| 50% | 100% | 90% | 40% | 30% | 20% | 20% | 20% | 20% |
| High: 44 °F | Low: 36 °F | High: 48 °F | Low: 32 °F | High: 48 °F | Low: 29 °F | High: 44 °F | Low: 29 °F | High: 43 °F |
| Chance Rain and Patchy Fog | Rain and Patchy Fog | Rain | Chance Rain | Chance Rain then Partly Sunny | Slight Chance Rain and Patchy Fog | Slight Chance Rain | Slight Chance Rain | Slight Chance Rain |

**Today:** A 50 percent chance of rain. Patchy fog after 4pm. Otherwise, mostly cloudy, with a high near 44. Calm wind. New precipitation amounts of less than a tenth of an inch possible.

**Tonight:** Rain, mainly after 10pm. Patchy fog before 7pm. Low around 36. Light northwest wind. Chance of precipitation is 100%. New precipitation amounts between a quarter and half of an inch possible.

**Friday:** Rain. High near 48. West wind 3 to 5 mph. Chance of precipitation is 90%. New precipitation amounts between a tenth and quarter of an inch possible.

**Friday Night:** A 40 percent chance of rain. Mostly cloudy, with a low around 32. Light and variable wind.

**Saturday:** A 30 percent chance of rain before 10am. Partly sunny, with a high near 48. Southwest wind 3 to 7 mph.

**Saturday Night:** A 20 percent chance of rain. Patchy fog after 1am. Otherwise, mostly cloudy, with a low around 29.

**Sunday:** A 20 percent chance of rain. Mostly cloudy, with a high near 44.

**Sunday Night:** A 20 percent chance of rain. Mostly cloudy, with a low around 29.

**Monday:** A 20 percent chance of rain. Mostly cloudy, with a high near 43.

**Monday Night:** A slight chance of rain. Mostly cloudy, with a low around 28.

**Tuesday:** A slight chance of rain. Mostly cloudy, with a high near 43.

**Tuesday Night:** A slight chance of rain. Mostly cloudy, with a low around 27.

**Wednesday:** Partly sunny, with a high near 42.

Toppenish WA
 46.37°N 120.3°W (Elev. 801 ft)

Visit your local NWS office at: <u>https://www.weather.gov/pdt</u>

**EXHIBIT H**

Declaration of Ethan Jones in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction

# *Glacier Elec. Coop., Inc. v. Gervais*

United States District Court for the District of Montana, Great Falls Division

April 24, 2015, Decided; April 24, 2015, Filed

CV14-75-GF-BMM

**Reporter**

2015 U.S. Dist. LEXIS 193816 *; 2015 WL 13650531

GLACIER ELECTRIC COOPERATIVE, INC., BRIAN ELLIOTT, WILLARD HJARTARSON, JIM NEWMAN, DARROL BERKRAM, ZITA BREMNER, MILES LEWIS, DAVE LOSING, and JAMES TAYLOR, in their official capacities as directors of Glacier Electric Cooperative, Inc., and DAN BREWER, in Ms official capacity as Interim General Manager of Glacier Electric Cooperative, Inc. Plaintiffs, vs. FLOYD "BOB" GERVAIS et al, Defendants.

**Subsequent History:** Motion denied by *Glacier Elec. Coop., Inc. v. Gervais, 2015 U.S. Dist. LEXIS 122876 (D. Mont., Sept. 15, 2015)*

**Counsel:** [*1] For Glacier Electric Cooperative, Inc., Brian Elliott, in their official capacities as directors of Glacier Electric Cooperative, Inc., Willard Hjartarson, in their official capacities as directors of Glacier Electric Cooperative, Inc., Jim Newman, in their official capacities as directors of Glacier Electric Cooperative, Inc., Darrol Berkram, in their official capacities as directors of Glacier Electric Cooperative, Inc., Zita Bremner, in their official capacities as directors of Glacier Electric Cooperative, Inc., Miles Lewis, in their official capacities as directors of Glacier Electric Cooperative, Inc., Dave Losing, in their official capacities as directors of Glacier Electric Cooperative, Inc., James Taylor, in their official capacities as directors of Glacier Electric Cooperative, Inc., Dan Brewer, in his official capacity as Interim General Manager of Glacier Electric Cooperative, Inc., Plaintiffs: David M. Wagner, LEAD ATTORNEY, CROWLEY FLECK PLLP, Bozeman , MT USA; Justin B. Lee, LEAD ATTORNEY, BURK LEE & BIELER PLLC, Choteau , MT USA; Kelsey E. Bunkers, LEAD ATTORNEY, Bozeman , MT.

For Floyd "bob" Gervais, James Kittson, Scott Smith, Emerald "beep" Grant, Suzie Murray, Tashina [*2] Mcnabb, William Guardipee, Fred Guardipee, Defendants: Terryl T. Matt, LEAD ATTORNEY, Bank , MT USA.

For Heather Juneau, Joseph Arrowtop, William Wetzel, Troy Wilson, Melissa Gervais, Wilfred Deroche, Georgia Matt, Rodney Minnow Gervais, Ralph Johnson, Mike Kittson, Kathy Broere, Lenore Matt, Evie Birdrattler, Rodney Gervais, Duane Ladd, Marcella Birdrattler, Tom Gervais, Jim Gervais, Marlene Matt, Wilfred Deroche, Titus Upham, John Deroche, Carl Evans, Jeri J Elliott, Dennis Juneau, Teri Ann Deroche, Paul Mcevers, Patricia Calflooking, Tony Carlson, Sarah Calf Boss Ribs, Kathy Gervais, Marcella Green, Ellen Burdeau, Randy Augare, Robert Wagner, Kenny Walter, Honey Davis, Anna Horn, Cherlyl Gervais, Anita Potts, Therese Salois, Faith Gervais, Defendants: Terryl T. Matt, LEAD ATTORNEY, ATTORNEY AT LAW, Cut Bank, MT USA.

**Judges:** Brian Morris, United States District Court Judge.

**Opinion by:** Brian Morris

# Opinion

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

## I. SYNOPSIS

The defendant individual members of Glacier Electric Cooperative, Inc. (collectively "Cooperative Members") have moved this Court to dismiss the complaint pursuant to *Fed. R. Civ. P. 12(b)(1)*, for failure to exhaust tribal court remedies. (Doc. 3). Plaintiff Glacier Electric Cooperative, **[*3]** Inc., the individual directors of Glacier Electric Cooperative, Inc., and the interim general manager of Glacier Electric Cooperative, Inc. (collectively "Glacier Electric") oppose the motion. (Doc. 6).

This case stems from a lawsuit rooted in the same legal issues as the one currently before the Blackfeet Tribal Court. (Doc. 1). Glacier Electric has moved to dismiss the Cooperative Members' complaint in the underlying Blackfeet Tribal Court case. (Doc. 1-2). Glacier Electric's motion to dismiss remains pending in Blackfeet Tribal Court. (Doc. 3).

## II. JURISDICTION and VENUE

The Court possesses jurisdiction under *28 U.S.C. § 1331*. Blackfeet Tribal Court jurisdiction over Glacier Electric presents a federal question. *Plains Commerce Bank v. Family Land & Cattle Co., 554 U.S. 316, 324, 128 S. Ct. 2709, 171 L. Ed. 2d 457 (2008)*.

Venue is proper under *28 U.S.C. § 1391(b)*. The corresponding tribal court suit currently remains venued in Blackfeet Tribal Court. The Blackfeet Tribal Court is located in Glacier County, Montana. Glacier County is within the Great Falls Division of the District of Montana.

## III. FACTUAL and PROCEDURAL BACKGROUND

Glacier Electric Cooperative, Inc. is a rural electric cooperative headquartered in Cut Bank, Montana. *Bird v. Glacier Elec. Coop., Inc., 255 F.3d 1136, 1139 (9th Cir. 2001)*. Glacier Electric is a non-profit corporation organized under Montana's Rural Electric and Telephone Cooperative Act, *MCA § 35-18-101*. (Doc. 1 at 3). Glacier Electric **[*4]** is the sole provider of electricity to the Blackfeet Reservation, (Doc. 3 at 2). The individual plaintiffs serve on Glacier Electric *s Board of Trustees, (Doc. 1 at 4-6), Glacier Electric Cooperative, Inc. and the individual Glacier Electric Cooperative Board Members are the defendants in the underlying Blackfeet Tribal Court suit. *Id.* at 2.

The Cooperative Members are members and qualified voters of Glacier Electric Cooperative, Inc. *Id.* The Cooperative Members reside on trust land and are enrolled members of the Blackfeet Tribe. *Id.* at 6. The Cooperative Members are the plaintiffs in the underlying Blackfeet Tribal Court suit. *Id.* at 2.

The Cooperative Members filed a complaint against Glacier Electric in the Blackfeet Tribal Court on August 6, 2014, (Doc. 1-2). Glacier Electric moved on October 1,2014, to dismiss the complaint in Blackfeet Tribal Court. (Doc. 3), The Cooperative Members filed a response brief on October 15, 2014. *Id.* Glacier Electric's motion to dismiss remains pending in Blackfeet Tribal Court. *Id.* Glacier Electric filed a complaint for declaratory and injunctive relief with this Court on October 17, 2014, based on the litigation in Blackfeet Tribal Court. (Doc. 1).

## IV. DISCUSSION

2015 U.S. Dist. LEXIS 193816, *4

Non-Indians [*5] may bring a cause of action under 28 U.S.C. § 1331 to challenge tribal court jurisdiction. *Elliott v. White Mountain Apache Tribal Ct., 566 F.3d 842, 846 (9th Cir. 2009)*. Subject to limited exceptions, a non-Indian is subject to a mandatory requirement to first exhaust remedies in tribal court before bringing suit in federal court. *Nat'l Farmers Union Ins, Cos. v. Crow Tribe of Indians, 471 U.S. 845, 850-53, 105 S. Ct. 2447, 85 L. Ed. 2d 818 (1985)*; *see also Marceau v. Blackfeet Hous. Auth. 540 F.3d 916, 920 (9th Cir. 2008)*.

The tribal court exhaustion requirement does not serve as a jurisdictional bar. *Grand Canyon Skywalk Devt LLC v. 'SA' NYU WA Inc.,715 F.3d 1196, 1200 (9th Cir. 2013)*. The exhaustion requirement instead represents a prerequisite to a federal court's exercise of its own jurisdiction. *Grand Canyon Skywalk, 715 F.3d at 1200*. A federal court may intervene only after the tribal appellate court has ruled on the jurisdictional issue. *Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 20, 107 S. Ct. 971, 94 L. Ed. 2d 10 (1987)*.

Principles of comity obligate the Court to dismiss or abstain from adjudicating claims over which tribal court jurisdiction is "colorable." *Atwood v. Fort Peck Tribal Ct. Assiniboine, 513 F.3d 943, 948 (9th Cir. 2008)*. The Court may relieve a non-Indian from the duty to exhaust, however, where it determines that tribal court jurisdiction is "plainly" lacking. *Strate v. A-1 Contractors, 520 U.S. 438, 459 n. 14, 117 S. Ct. 1404, 137 L. Ed. 2d 661 (1997)*; *see also Nat'l Farmers Union Ins. Cos., 471 U.S. at 854*. Accordingly, the Court must determine whether the Blackfeet Tribal Court "plainly" lacks jurisdiction over Glacier Electric.


**A. Tribal Court Jurisdiction Based on Glacier Electrics Member Status**

The Cooperative Members first allege that Glacier Electric qualifies as an "Indian-owned" entity based on Glacier Electric's [*6] majority Blackfeet tribal membership. (Doc. 3). The Cooperative Members argue that Glacier Electric's status as an "Indian-owned" entity provides for tribal court jurisdiction without consideration of the decision in *Montana v. United States, 450 U.S. 544, 101 S. Ct. 1245, 67 L. Ed. 2d 493 (1981)*, and its progeny. *Id.* Glacier Electric counters that it is a non-member corporation irrespective of its alleged majority tribal membership. (Doc. 6), Glacier Electric cites *Airvator v. Turtle Mountain Mfg. Co., 329 N.W.2d 596, 602 (N.D. 1983)*, for the proposition that a state-chartered corporation should be treated as a non-Indian independent of its percentage of Indian shareholders. *Id.*

Tribal courts are not courts of general jurisdiction. *Philip Morris USA, Inc. v. King Mountain Tobacco Co., 569 F.3d 932, 939 (9th Cir. 2009)*. The Cooperative Members are Blackfeet tribal members subject to the Blackfeet Tribal Court's jurisdiction. BLACKFEET LAW AND ORDER CODE, Chapter 1, Section 1. A tribally-owned entity may be treated as a tribal member for the purposes of tribal court jurisdiction. *Smith v. Salish Kootenai Coll., 434 F.3d 1127, 1135 (9th Cir. 2006)* (en banc). Individual members of a federally recognized tribe that operate a business entity, however, generally stand distinct from tribally-owned entities. *Puyallup Tribe, Inc. v. Dept. of Game of State of Wash., 433 U.S. 165, 172-73, 97 S. Ct. 2616, 53 L. Ed. 2d 667 (1977)*.

Glacier Electric does not qualify as a tribally-owned entity. *See White v. Univ. of Cal., 765 F.3d 1010,1025-26 (9th Cir. 2014)*. The Blackfeet Tribe did not create Glacier Electric pursuant to tribal law. *See White, 765 F.2d at 1025-26*. The Blackfeet Tribe **[\*7]** does not own or operate Glacier Electric. *Id.* It appears that Glacier Electric would not qualify as a tribally-owned entity within the jurisdiction of the Blackfeet Tribal Court even if Blackfeet tribal members constituted all of Glacier Electric's cooperative members.

District courts within the District of Montana previously have characterized Glacier Electric as a non-tribal corporation and a non-member of the Blackfeet Tribe for the purposes of tribal court jurisdiction. *E.g., Glacier Elec. Coop,, Inc. v. Williams, 96 F. Supp. 2d 1089,1090 (D. Mont. 1999)*. The Ninth Circuit also has cast doubt on the Cooperative Member's argument that Glacier Electric is an Indian-owned entity based on its majority tribal customer membership. *See, e.g., Big Horn Cnty. Elec. Coop. Inc. v. Adams, 219 F.3d 944, 949 n.1 (9th Cir. 2000)*, It does not appear that the Cooperative Members possess a colorable claim of tribal court jurisdiction based on the membership status of the parties.

## B. Tribal Court Jurisdiction Based on the Inherent Right to Exclude

The Cooperative Members next rely on *Evans v. Shoshone-Bannock, 736 F.3d 1298 (9th Cir. 2013)* for the proposition that tribal jurisdiction can be established in cases involving non-Indians where the tribe controls the land on which the **[\*8]** dispute arose, (Doc. 3), The Cooperative Members cite *Strate* and *McDonald v. Means, 309 F.3d 530 (9th Cir. 2002)*, to support the claim that tribes retain inherent authority over the conduct of non-members on Indian fee or trust land. *Id.* Following this line of reasoning, the Cooperative Members argue that Glacier Electric's actions impact Indians who reside on trust land, and given the tribe's inherent authority over this trust land, the tribal court possesses jurisdiction. *Id.* Glacier Electric fails to address this argument. (Doc. 6).

2015 U.S. Dist. LEXIS 193816, *8

The inherent sovereign powers of an Indian tribe generally do not extend to the activities of nonmembers on non-Indian fee land within its borders. *Plains Commerce Bank, 554 U.S. at 328*. An Indian tribe possesses authority, however, to regulate activities that take place on tribal land based on the tribe's inherent power to exclude. *South Dakota v. Bourland, 508 U.S. 679, 689, 113 S. Ct. 2309, 124 L. Ed. 2d 606 (1993); see also New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 333, 103 S. Ct. 2378, 76 L. Ed. 2d 611 (1983)*. A tribe's adjudicatory authority remains coextensive with its regulatory authority. *Strate, 520 U.S. at 453*, The Ninth Circuit has determined that a tribe's inherent authority over tribal land may provide for regulatory authority over non-Indians on tribal land based on the inherent right to exclude. *Grand Canyon Skywalk, 715 F.3d at 1204; see also Water Wheel Camp Recreational Area, Inc. v. LaRance, 642 F.3d 802, 804-05 (9th Cir. 2011)*.

This Court's analysis begins with *Grand Canyon Skywalk, In Grand Canyon Skywalk*, a non-Indian corporation and a tribal **[*9]** corporation entered Into a contract to construct and manage a tourist attraction on tribal land, *715 F.3d at 1199*. The tribe invoked its eminent domain authority when it commenced proceedings in tribal court to acquire the non-Indian corporation's interest. *Id.* The non-Indian corporation petitioned for a temporary restraining order in federal court. *Id.* The district court denied the petition and required the non-Indian corporation first to exhaust tribal court remedies. *Id.* The Ninth Circuit affirmed. *Id.*

The Ninth Circuit recognized that the tribe retained the power to limit access to the tourist attraction given the attraction sat on tribal land. *Id. at 1204*, The contract between the non-Indian corporation and the tribal corporation interfered with the tribe's right to exclude the non-member corporation from the reservation. *Id.* Tribal court jurisdiction was not "plainly" lacking based on the tribe's power to exclude, which provides for the lesser powers to regulate and adjudicate. *Id. at 1205* (citing *Water Wheel, 642 F.3d 802*? and *Bourland, 508 U.S. 679, 113 S. Ct. 2309, 124 L. Ed. 2d 606*).

Glacier Electric agreed to provide utility services on the Blackfeet Reservation in exchange for a fee similar to the non-Indian corporation in *Grand Canyon Skywalk. Id. at 1204*. Glacier Electric's access to a customer base and tribal land likewise **[*10]** serves 3.S the basis for the agreement. *Id.* The Blackfeet Tribe, like the tribe in *Grand Canyon Skywalk*, retains the right to exclude non-members from its land. *Id.* The conduct of Glacier Electric in this instance potentially interferes with the Tribe's right to exclude. *Id.*

Whether the land underlying the dispute is Indian or non-Indian remains unclear from the record at this point. The record Indicates that relevant conduct may have taken place on both Indian and non-Indian lands. Significantly,

nothing in the record establishes that Glacier Electric's actions took place exclusively on a congressionally-granted right-of-way within the Blackfeet reservation. *See, e.g., Burlington N. R.R. Co. v. Red Wolf, 196 F.3d 1059, 1064 (9th Cir. 1999)* (stating that a railroad's congressionally-granted right-of-way is the equivalent of non-Indian fee land),

The Court at this juncture simply must determine whether jurisdiction is "plainly" lacking. The standard set forth in *Grand Canyon Skywalk* applies to this case irrespective of the ambiguous nature of the land ownership, Glacier Electric's actions, at the minimum, amount to an intrusion on the Blackfeet Tribe's right to exclude, Glacier Electric's actions could be subject to the Blackfeet Tribe's right to regulate **[*11]** and adjudicate non-members based on interference with its right to exclude.

## D. Colorable Jurisdiction Under the *Montana* Exceptions

The limitation on tribal court jurisdiction established by *Montana* and its progeny apply generally to questions of jurisdiction arising on non-Indian land or its equivalent. *Water Wheel, 642 F.3d at 809*. The general rule established by *Montana* is not invoked automatically given the ambiguous nature of the land status underlying this dispute. *Id.* If further development of the record indicates that Glacier Electrics actions took place exclusively on non-Indian fee land and *Montana* is applied, the Cooperative Members still potentially possess a colorable claim of jurisdiction under the exceptions to *Montana's* general rule.

The Cooperative Members contend that its claims meet both *Montana* exceptions based on Glacier Electric's consensual relationship with the Blackfeet Tribe and the effect that Glacier Electric's winter shut-offs have on the economic security, health, and welfare of the tribe. (Doc. 3). Indian tribes retain inherent sovereign power pursuant to the first *Montana* exception to exercise some forms of civil jurisdiction over non-Indians on their reservations where non-members **[*12]** enter into consensual relationships with the tribe or its members. *Montana, 450 U.S. at 565*. The consensual relationship involves commercial dealings, contracts, leases, or other arrangements. *Id.*

The first *Montana* exception applies equally whether the relationship is with the tribe itself or its members. *Grand Canyon Skywalk, 715 F.3d at 1206; see also Montana, 450 U.S. at 565*. Glacier Electric has entered into a consensual relationship with Blackfeet tribal members under *Montana's* first exception. *Big Horn Cnty. Elec. Coop., Inc., 219 F.3d at 951*. The court in *Big Horn County* determined that an electric cooperative that voluntarily

2015 U.S. Dist. LEXIS 193816, *12

provides electrical services on a reservation creates a consensual relationship as contemplated by *Montana's* first exception. *Id.*

The second *Montana* exception provides for tribal civil jurisdiction over non-Indians where the non-Indian activity threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. *Montana, 450 U.S. at 565*, The Cooperative Member's allegation that Glacier Electric conducts winter shut-offs undoubtedly has a direct effect on the health or welfare of the Blackfeet Tribe, The Cooperative Members possess a colorable claim of jurisdiction over Glacier Electric based on the *Montana* exceptions given the consensual nature of the relationship **[\*13]** between the parties and the potential impact of the relationship on the health and welfare of the Blackfeet tribal members.


## V. CONCLUSION

The proper question before the Court is whether "it is plain" that the Blackfeet Tribal Court lacks jurisdiction. *Strate, 520 U.S. at 459*, The Blackfeet Tribal Court stands in the best position to develop the factual record, The Blackfeet Tribe's inherent regulatory authority over tribal land serves as a colorable basis to support civil tribal court jurisdiction. It is not apparent to the Court at this stage of the litigation that the Blackfeet Tribal Court "plainly" lacks jurisdiction over this matter as to excuse Glacier Electric from exhausting tribal court remedies. *Grand Canyon Skywalk, 715 F.3d at 1205*.

**IT IS HEREBY ORDERED** the defendant Cooperative Member's motion to dismiss (Doc. 3) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff Glacier Electric's Complaint (Doc. 1) is DISMISSED WITHOUT PREJUDICE for failure to exhaust tribal court remedies.

DATED this 24th day of April, 2015.

/s/ Brian Morris

Brian Morris

United States District Court Judge

---

**EXHIBIT I**

Declaration of Ethan Jones in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction

# *Rincon Mushroom Corp. of Am. v. Mazzetti*

United States Court of Appeals for the Ninth Circuit

May 20, 2024[**], Submitted, San Francisco, California; June 20, 2024, Filed

No. 23-55111

**Reporter**

2024 U.S. App. LEXIS 14952 *; 2024 WL 3066049

RINCON MUSHROOM CORPORATION OF AMERICA, a California corporation; MARVIN DONIUS, a California resident, Plaintiffs-Counter-Defendants-Appellants, v. BO MAZZETTI; JOHN CURRIER; VERNON WRIGHT; GILBERT PARADA; STEPHANIE SPENCER; CHARLIE KOLB; DICK WATENPAUGH; TISHMALL TURNER; STEVE STALLINGS; LAURIE E. GONZALEZ; ALFONSO KOLB, Sr.; MELISSA ESTES; RINCON BAND OF LUISENO INDIANS, a federally recognized Indian Tribe, Defendants-Counter-Claimants-Appellees, v. COUNTY OF SAN DIEGO; SAN DIEGO GAS & ELECTRIC COMPANY, Third-Party-Defendants-Appellees.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** [*1] Appeal from the United States District Court for the Southern District of California. William Q. Hayes, District Judge, Presiding. D.C. No. 3:09-cv-02330-WQH-JLB.

*Rincon Mushroom Corp. of Am. v. Mazzetti, 2022 U.S. Dist. LEXIS 216289, 2022 WL 17345485 (S.D. Cal., Nov. 30, 2022)*

**Disposition:** AFFIRMED.

**Counsel:** For RINCON MUSHROOM CORPORATION OF AMERICA, a California corporation, MARVIN DONIUS, a California resident, Plaintiff-counter-defendant - Appellant: Manuel Corrales Jr., Esquire, Attorney, Law Office of Manuel Corrales, Jr., San Diego, CA; Rupa G. Singh, Esquire, Niddrie Addams Fuller Singh, LLP, San Diego, CA.

---

[**] The panel unanimously concludes this case is suitable for decision without oral argument. See Fed. R. App. P. 34(a)(2).

For BO MAZZETTI, JOHN CURRIER, VERNON WRIGHT, GILBERT PARADA, STEPHANIE SPENCER, CHARLIE KOLB, DICK WATENPAUGH, TISHMALL TURNER, STEVE STALLINGS, LAURIE E. GONZALEZ, ALFONSO KOLB, Sr., MELISSA ESTES, RINCON BAND OF LUISENO INDIANS, a federally recognized Indian Tribe, Defendants-counter-claimants - Appellees: Scott David Crowell, Esquire, Attorney, Crowell Law Offices, Sedona, AZ; Denise Turner Walsh, Rincon Band of Luiseno Indians, Valley Center, CA.

For COUNTY OF SAN DIEGO, Third-party-defendant - Appellee: John Peter Cooley, Esquire, Office of County Counsel, County of San Diego, San Diego, CA; Katie A. Richardson, Office of County Counsel, County of San Diego, San Diego, CA.

For SAN DIEGO GAS & ELECTRIC COMPANY, **[*2]**  Third-party-defendant - Appellee: Raul Olamendi Smith, Esquire, Managing Attorney, SDG&E Law Department, San Diego, CA; Steven Brunolli, Attorney, Higgs Fletcher & Mack, LLP, San Diego, CA; John Marcher Morris, Esquire, Attorney, Higgs Fletcher & Mack, LLP, San Diego, CA.

**Judges:** Before: GRABER and FORREST, Circuit Judges, and SELNA,*** District Judge.

# Opinion

MEMORANDUM*

Marvin Donius, a non-Indian, owns a five-acre parcel of land (the Property) located within the Rincon Band of Luiseno Indians' (the Tribe) reservation in California. Rincon Mushroom Corporation of America (RMCA) has a financial interest in the Property. After the Tribe asserted regulatory jurisdiction over the Property, Donius and RMCA (collectively, Plaintiffs) sued, challenging the Tribe's regulatory authority. The tribal trial and appellate courts held that the Tribe has regulatory jurisdiction over the Property. Plaintiffs challenged the tribal court's decision in federal district court, which agreed with the tribal court and, consequently, recognized and enforced the tribal court's judgment. Plaintiffs appeal. We have jurisdiction under *28 U.S.C. §1291*, and we affirm.

**1. *Personal Jurisdiction***. Plaintiffs contend that the tribal court lacked personal **[*3]**  jurisdiction over them. Plaintiffs raised this issue in a heading in their summary judgment brief filed in the district court but did not

---

*** The Honorable James V. Selna, United States District Judge for the Central District of California, sitting by designation.

* This disposition is not appropriate for publication and is not precedent except as provided by *Ninth Circuit Rule 36-3*.

develop the argument. The district court rejected this challenge, noting that "Plaintiffs do not explain the basis for their contention that the Rincon Tribal Court lacked personal jurisdiction over them." We conclude that the Plaintiffs' personal jurisdiction challenge is forfeited. *See, e.g., Consumer Fin. Prot. Bureau v. Aria, 54 F.4th 1173 (9th Cir. 2022)* ("Because [the plaintiff] did not adequately raise these arguments to preserve them below, he has forfeited them."); *G & G Prods. LLC v. Rusic, 902 F.3d 940, 950 (9th Cir. 2018)* ("A party's unexplained failure to raise an argument that was indisputably available below is perhaps the least 'exceptional' circumstance warranting our exercise of . . . discretion.").

**2. *Subject Matter Jurisdiction of the Tribal Court***. The second *Montana* exception provides that tribes have sovereign authority to regulate nonmembers' conduct on non-Indian land located within a reservation that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana v. United States, 450 U.S. 544, 565-66, 101 S. Ct. 1245, 67 L. Ed. 2d 493 (1981)*. When a tribe has regulatory jurisdiction, tribal courts generally have adjudicatory jurisdiction to enforce those regulations. **[*4]** *See FMC Corp. v. Shoshone-Bannock Tribes, 942 F.3d 916, 941 (9th Cir. 2019)* (holding that "[a] tribe's adjudicatory jurisdiction over nonmembers may not exceed its regulatory jurisdiction," but "the existence of regulatory jurisdiction"—along with "the nature of the tribal sovereign interests, long-standing principles of Indian law, and congressional interest in tribal self-government"—typically supports a finding of adjudicatory jurisdiction). Here, the tribal trial court found that it had subject matter jurisdiction under this principle, and both the tribal appellate court and federal district court agreed. For the reasons that follow, Plaintiffs' challenges to the tribal court's subject matter jurisdiction fail.

The tribal court found that (1) the Property's "condition" and "poor maintenance" posed a significant wildfire risk to the Tribe's nearby casino, which would be catastrophic to the Tribe's economic interests and (2) "the activities on [the] [P]roperty, if allowed to continue unchecked, bear a distinct possibility of damaging [the Tribe's] 'pristine' water table." Plaintiffs dispute these findings because the tribal court did not find that *actual* fire damage to the casino or contamination of the water table had occurred. But proof of existing **[*5]** harm is not required, *see Montana, 450 U.S. at 566* (tribes have regulatory authority "when . . . conduct threatens *or* has some direct effect" on the tribe's welfare (emphasis added)), and Plaintiffs have not shown that the tribal court's findings regarding the threat of future harm are clearly erroneous, *see FMC, 942 F.3d at 930* (stating standard). Moreover, we conclude that the possibility of wildfire damage to the tribe's primary source of income and contamination of its sole water

source "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Lexington Ins. Co. v. Smith, 94 F.4th 870, 875-76 (9th Cir. 2024)* (quoting *Montana, 450 U.S. at 566*). The Tribe's "economic security" hinges on the casino gaming operations that are its "major source of revenue." Likewise, "[t]hreats to tribal natural resources . . . constitute threats to tribal self-governance, health and welfare," *FMC, 942 F.3d at 935*, especially because the natural resource at issue here is the Tribe's "single water source," on which it is "dependent."

The tribal court also found that the local county would not regulate the Property because Indian reservations are exempt from the County's land use ordinances. This finding was supported by evidence and was properly considered by the tribal court. We conclude **[*6]** that the tribal court did not err in concluding that it had subject matter jurisdiction under the second *Montana* exception. *See Plains Com. Bank v. Long Fam. Land & Cattle Co., 554 U.S. 316, 341, 128 S. Ct. 2709, 171 L. Ed. 2d 457 (2008)* (stating that the second *Montana* exception applies where "tribal power [is] necessary to avert catastrophic consequences" (citation omitted)).[1]

**3. *Scope of the Injunction*.** Plaintiffs argue that even if the tribal court had subject matter jurisdiction, the injunction that it entered was impermissibly overbroad. Plaintiffs did not challenge the operative injunction in the tribal appellate court; therefore, this issue is not properly before us. *See Elliott v. White Mountain Apache Tribal Ct., 566 F.3d 842, 846 (9th Cir. 2009)* ("'Non-Indians may bring a federal common law cause of action under *28 U.S.C. § 1331* to challenge tribal court **[*7]** jurisdiction.' But a plaintiff must first exhaust tribal court remedies." (citation omitted)).

**4. *Leave to Amend*.** The district court denied Plaintiffs' motion to amend their complaint to add new parties because of undue delay and prejudice to the proposed defendants. On appeal, Plaintiffs challenge only the district court's finding of undue delay. Because the district court's prejudice finding is sound, *see AmerisourceBergen Corp. v. Dialysist W., Inc., 465 F.3d 946, 952-53 (9th Cir. 2006)*, Plaintiffs' challenge fails, *see Bowles v. Reade, 198 F.3d 752, 757 (9th Cir. 1999)*.

**AFFIRMED**.

---

[1] In 2017, the tribal trial court concluded it had subject matter jurisdiction. Then, in its 2019 judgment, it noted that its 2017 order "found jurisdiction need only be 'colorable or plausible.'" Plaintiffs correctly point out that the issue is not whether jurisdiction was "colorable or plausible," but whether it actually existed. And the 2019 order is particularly puzzling because the 2017 order does not reference the "colorable or plausible" standard. Regardless, we review the legal rulings on tribal jurisdiction de novo, *Lexington Ins. Co., 94 F.4th at 878*, and we conclude, applying the correct legal standard, that the tribal court had jurisdiction.

2024 U.S. App. LEXIS 14952, *7

---

**End of Document**